WINDOM, Presiding Judge.
David Dewayne Riley appeals his capital-murder conviction and sentence of death.[1] Riley was convicted of murder made capital for taking the life of Scott Michael Kirtley during the course of a first-degree robbery. See § 13A-5-40(a)(2), Ala.Code 1975. Following the penalty phase of the trial, the jury unanimously recommended that Riley be sentenced to death. After holding a sentencing hearing and weighing the aggravating and mitigating circumstances, the circuit court accepted the jury’s recommendation and sentenced Riley to death. On April 13, 2011, Riley filed a motion for new trial. Following a hearing, the circuit court denied Riley’s motion.

Facts

On January 10, 2005, Riley shot and killed Kirtley, the cashier at Dandy’s Package Store Number 2 (“Dandy’s” or “the package store”) in Florence, during a robbery.
Several hours before the robbery, Riley and his friend, Dewon Jones, were walking through a neighborhood near Dandy’s when Riley stopped by the store to purchase some soft drinks. On the surveillance tape, Riley is seen walking around the store, looking into two of the store’s three security cameras, purchasing two soft drinks, and then leaving the store. After he left, Riley told Jones that he was in a “jam” and was thinking of robbing the store. Jones attempted to dissuade Riley, telling him “it was a crazy idea” (R. 1077), but Riley insisted that he needed the money for his debts. Jones agreed to help, and they devised a plan wherein Jones *712 would serve as the lookout. Later that day the two men returned to the package store.
The package store’s surveillance video depicts Riley entering the store and robbing Kirtley. At some point during the robbery, a customer pulled into the parking lot and Jones attempted to telephone Riley to warn him, but the call would not go through. When the customer entered the store and approached the register, Riley calmly backed away, concealed his weapon, and ordered Kirtley to make the sale. (State’s exhibit 37.) Riley counted the stolen money and placed it in his pocket while the customer checked out at the register. Riley then allowed the customer to leave before forcing Kirtley into a back room outside the view of the surveillance cameras. The events that took place in the back room cannot be seen on the surveillance video, but they can be heard on the audio portion of the tape. Riley fired a shot, and Kirtley screamed in pain. After a brief pause, Riley fired a second shot. Following a final pause, Riley fired another shot before returning to the main area of the store. Riley collected two of the three videos from the store surveillance cameras before exiting the store with the proceeds of the robbery.
After leaving the package store, Riley and Jones walked to a friend’s house wheré they hid the stolen items in a tree house in the friend’s backyard. The two men later met at Jones’s house. Riley asked Jones to hide the gun for him. Jones agreed, and Riley placed the gun inside a closet, where it was recovered by law-enforcement officers later that night.
Thomas Newbern went to Dandy’s around 7:30 p.m. on January 10, 2005. He noticed that another customer was already waiting, but the clerk was not at the counter. Newbern then went into the back of the store to locate the missing clerk and discovered Kirtley’s body. Newbern telephoned emergency 911.
Sergeant Cliff Billingsley of the Florence Police Department was dispatched to the package store where he met Newbern and two female customers. Billingsley entered the cooler door toward the back of the store and observed Kirtley lying on the floor in a pool of blood. Moments later, two firemen arrived and checked Kirtley’s vital signs. Billingsley observed a powder or smoke-like substance coming out of the side of Kirtley’s head near his ear. As additional officers arrived at the, scene, Billingsley noticed that “the cash register area appeared to be disturbed” and that “it was possibly a robbery.” (R. 507.)
As part of their investigation, law-enforcement officers provided the local news media with a copy of the surveillance video to be aired on the news. Shortly after the video aired,-,David Ashley, an acquaintance of Riley, came forward and identified Riley as the individual on the video. That same evening, Florence Police Officer Chuck Hearn also viewed the surveillance tapes from the crime scene and recognized Riley from a previous encounter. After identifying Riley, Ashley rode with law-enforcement officers to locate Riley’s residence.
When the officers arrived at the residence, Riley, who was on the front porch, mistakenly thought that the unmarked police car was a friend’s vehicle and began running toward the car. Riley was arrested, given his Miranda[2] rights, and patted down for officer safety. During the pat-down, officers found three packs of cigarettes in Riley’s pockets. Officer Hearn testified that one of the packs “had a red mark on it that appeared to be blood.” (R. 619.)
*713 Riley’s blue jeans and the pack of cigarettes with the red spot were later sent to the Alabama Department of Forensic Sciences (“DFS”) for DNA testing, which revealed that the spot on the pack of cigarettes was Kirtley’s blood. An autopsy of Kirtley’s body revealed that he had been shot three times. Two of the gunshots were fired from an intermediate range, indicating that the gun was anywhere from one inch to three feet away, while the third shot was classified as a contact wound, indicating that the shot was fired from an inch or less away.

Standard of Review

Because Riley has been sentenced to death, according to Rule 45A, Ala. R.App. P., this Court must search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.’” Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
‘‘See also Ex parte Hodges, 856 So.2d 936; 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
11 So.3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Although Riley’s failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991).

Discussion

I.
On appeal, Riley argues that the prosecutor committed reversible error by improperly relying on his accomplice’s felony-murder conviction as substantive evidence of Riley’s guilt. Riley further argues that the circuit court erroneously instructed the jury, over defense coun *714 sel’s objection, regarding the differences between felony murder and capital murder in relation to Jones, Riley’s accomplice.
Contrary to Riley’s assertion, it was defense counsel, not the State, who sought to use Jones’s conviction for felony murder as substantive evidence to show that Riley should also be convicted of felony murder as opposed to capital murder. The State, in response, then argued that Riley’s participation in the crime differed from Jones’s such that Riley should be convicted of capital murder.
The record reveals that Jones, Riley’s accomplice, was initially charged with capital murder as a result of his involvement in the robbery-murder that occurred at Dandy’s, but that charge was later reduced to felony murder. Jones was ultimately convicted of felony murder and sentenced to 30 years in prison. As part of Riley’s defense, defense counsel called Jones as a witness with the intent of eliciting evidence indicating that the shooting was unintentional. (Riley’s brief, at 12 n.S.) When Jones’s testimony proved to be unhelpful to Riley’s defense strategy, defense counsel then impeached Jones by questioning him about his felony-murder conviction and sentence for his participation in the crime. Defense counsel did not merely impeach Jones with his conviction, but also sought to draw parallels between Jones’s conviction and sentence and the charge for which Riley was on trial. Consequently, it was defense counsel, and not the prosecution, who attempted to use Jones’s felony-murder conviction and sentence as substantive evidence to show that Riley, like Jones, should be convicted of felony murder.
Following the defense’s direct examination of Jones, in which defense counsel attempted to show why Riley should also be- convicted of felony murder, the State attempted to ferret out the differences between Jones’s and Riley’s intent at the time of the offense by asking Jones about his role in the robbery and whether they had had “any prior discussion about murdering Scott Kirtley.” (R. 1115.) Jones subsequently testified that he “didn’t intend for nobody to get hurt.” (R. 1115.)
Further, during closing arguments, the State made the following statements in order to rebut the defense’s argument that, based on Jones’s conviction, Riley should also be convicted of felony murder:
“That leaves us capital murder and felony murder and in understanding the distinction between capital murder and felony murder, you’re also going to understand Dewon Jones. Now capital murder requires, and it’s very important. An absolutely critical legal element of capital murder is that specific particularized intent to kill and I’ve already explained to you the evidence of why this man, the trigger man, the gunman had it in his mind to kill Scott Kirtley. There’s no question about that.
“Now in the State of Alabama for a non-trigger man, Dewon Jones, he didn’t have the gun. He was standing outside with a cell phone to signal the killer if somebody was coming in the store. In order for that accomplice, the non-trigger man to be guilty of capital murder you have got to prove that likewise De-won Jones had that same specific intent to kill, that not only Dewon was down for the robbery but Dewon meant for David to go in that store and execute Scott. That’s what would have to be required for Dewon Jones to be guilty of capital murder.
“And I’m sorry but Detective Red-cross did a thorough investigation. He even told Mr. Aldridge it was an ongoing investigation. Part of what was ongoing is we were combing the witnesses, the jail calls, everything to see if there was any evidence of premeditation of Dewon *715 Jones’s intent to kill Scott Kirtley. But it wasn’t there. It just wasn’t there.
“Now it’s ample for this guy, the one who marched him to the back and put the gun to his head. There’s no question what his intent was to do. The question that came in is what did Dewon intend when he was outside? Now he admitted like he did on the witness stand that he was the lookout. I was down with the robbery but I didn’t know anybody was going to get killed. I didn’t know he was going to go in there and do all that. That’s the difference, members of the jury, and under the law whether you like it or not when someone goes along with a robbery and someone gets killed, that’s felony murder because it’s the absence of that specific particularized intent to kill and that’s what we did with Mr. Jones. We followed the evidence. We followed the law and he is only guilty of felony murder.
“But then there’s the other guy. Then there’s the gunman. Then there’s the one who actually had this gun in his hand, marched — why did he have to do that? Did it have to go down that way? What could have happened after [the customer] left that store? Did he leave? Did he take his money and his loot and leave? No. What did he do? What did he do? And from the time he marches Scott off camera and you hear those gunshots, that’s the specific particularized intent to kill for the gunman and that evidence was just absent for the lookout standing outside. So by law those two have to be treated differently and Dewon Jones was convicted of exactly what he did: Participated in a robbery intentionally where someone got killed. That’s the non-trigger man and he’s doing his time for it.
“But when you take the murderer, triggerman, the one who made the call, the one who made the' decision to march Scott into that room and execute him, that’s apples and oranges, members of the jury. That’s apples and oranges. Dewon Jones may only be guilty of felony murder but this one, the gunman, the one who executed Scott during the robbery is guilty of a whole lot more. That’s what you need to convict him of. Convict him of exactly what he did. Particularized specific intent to kill during an armed robbery is capital murder. Thank you.”
(R. 1161-63.)
“It is well settled that ‘[a] prosecutor has the right to “reply in kind” to statements made by defense counsel in the defense’s closing argument.’ Newton v. State, [78 So.3d 458, 478] (Ala.Crim.App.2009) (citations and quotations omitted). ‘ “When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.” ’ Davis v. State, 494 So.2d 851, 855 (Ala.Crim.App.1986) (quoting DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469-70 (1982-83)).”
Vanpelt v. State, 74 So.3d 32, 82 (Ala.Crim.App.2009).
In this ease, the State properly rebutted defense counsel’s attempt to create parallels between Jones’s conviction and sentence and the conviction and sentence the State sought for Riley. Likewise, the circuit court’s instruction regarding the difference between felony murder and capital murder in relation to Jones was proper in light of Riley’s attempt to use Jones’s conviction to argue that he should be convicted of the lesser crime of felony murder.[3] *716 Because the State merely replied in kind to defense counsel’s argument and the circuit court instructed the jury regarding its consideration of Riley’s argument, no error, much less plain error, occurred.
Moreover, the only question in this case was whether Riley was guilty of capital murder or felony murder. Thus, admitting evidence that Jones had been convicted of felony murder could have only helped Riley’s defense. Accordingly, even if there were error, it would not have affected Riley’s substantial rights or have had an unfair prejudicial impact on the jury’s deliberations. See Ex parte Brown, 11 So.3d at 938; Rule 45A, Ala. RApp. P. Accordingly, Riley is not entitled to any relief.
II.
Riley next argues that the circuit court improperly sentenced him to death using an inadequate presentence report. Because the presentence report used in this case was the same document used in his first trial, Riley contends that it was not updated to include any information regarding his conduct while incarcerated during the last four years pending retrial and did not contain sufficient details of his social, medical, and psychological histories. The record does not show that Riley objected to the contents of the presentence report. Accordingly, this Court reviews this issue for plain error. See Rule 45A, Ala. RApp. P.
In Wilson v. State, 42 So.3d 732, 800 (Ala.Crim.App.2010) (opinion on return to remand), this Court addressed a similar challenge to the adequacy of a defendant’s presentence report, stating:
“In support of his argument, Wilson relies on Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), in which this Court reversed Guthrie’s sentence based on an insufficient presentence-investigation report. Specifically, this Court took issue with the lack of recent information in Guthrie’s personal- and social-history section of the report, and its lack of any information in Guthrie’s evaluation-of-offender section. In Guthrie, this Court held:
“ ‘This presentence report’s cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court’s consideration of the full mosaic of Guthrie’s background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b)[, Ala.Code 1975]. We find that the insufficiency of this report requires a remand for the trial court to reconsider Guthrie’s sentence with a sufficient presentence report.’
“689 So.2d at 94[7].
“In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), this Court distinguished Guthrie, stating:
“ ‘In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie’s sentence and remanded the case for the trial court “to reconsider Guthrie’s sentence with a sufficient presentence report.” 689 So.2d at 947....
[[Image here]]
“ ‘ “The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury’s advisory verdict is proper and if not, what the appropriate sentence should be.” Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, *717 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
“ ‘Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the “full mosaic of [Jackson’s] background and circumstances” before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie’s personal and social history contained in the report had been taken from an interview that was conducted at least five years before his sentencing hearing and no attempt had been made to update that information for purposes of the presen-tence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
“ ‘Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson’s trial, ... we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
‘“In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goffs and Dr. Smith’s psychological evaluations containing extensive information about Jackson’s life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not “hamstrung” into determining Jackson’s sentence without consideration of “the full mosaic” of Jackson’s background and circumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999). Therefore, we find no error, plain or otherwise, as to this claim.’
“791 So.2d at 1033-34. See also Lee v. State, 898 So.2d 790 (Ala.Crim.App. 2001); Johnson v. State, 820 So.2d 842 (Ma.Crim.App.2000)..
“As in Jackson, the circuit court here was presented with ‘the full mosaic’ of Wilson’s background and circumstances. During the penalty phase, Wilson presented testimony from his mother, who testified at length about Wilson’s childhood, and from a childhood neighbor, who testified about Wilson’s willingness to aid her in her capacity as a disaster-relief worker. See Ex parte Washington, 106 So.3d 441, 450 (Ala.2011) (expressly refusing to hold that ‘the adequacy of the presentence report should be evaluated in isolation’). In addition, the reports that Wilson complains should have been part of the presen-tence-investigation report — the competency-exam report and the youthful-offender-investigation report — were, in fact, part of the circuit court’s file and are part of the record on appeal. (C. 29, 47-53; 1st Supp. C. 18-24.)
“Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presentence-investigation report, this Court holds that any inadequacy in the *718 presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P.; Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding there was ‘no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information’). Accordingly, this issue does not entitle Wilson to any relief.”
142 So.3d at 799-800.
The record before us indicates that the circuit court carefully considered “the full mosaic of [Rileyl’s background and circumstances before determining the proper sentence.” Guthrie v. State, 689 So.2d 935, 947 (Ala.Crim.App.1996). The five-page presentence report prepared by Tom Wright of the Alabama Probation and Parole office fully detailed the facts and circumstances of Riley’s current offense, listed his entire criminal history, provided information on his daughter, noted that he had spent time in foster care and group homes, addressed his general health and admission of drug and alcohol abuse, discussed his educational background and the reasons that he dropped out of school, noted his lack of employment, and contained information about his immediate family, including his deceased sibling and estranged biological mother. Additionally, Riley’s probation officer included a letter along with the presentence report stating that “the information [prepared on February 13, 2007] remains the same. There are NO revisions, and nothing new to add.” (C. 335.) Further, the circuit court’s 16-page sentencing order indicates that it engaged in a comprehensive review of “everything presented that in any [way] could be construed as mitigating,” which included the transcript from Riley’s first trial. (C. 358-59.) The circuit court’s review included, but was not limited to, considering evidence of Riley’s difficult upbringing, his troubled childhood, the death of his sibling, his estranged relationship with his mother, his substance-abuse problems, his age at the time of the offense, any alleged mental-health issues, evidence of three separate head traumas, and the well-being of his young daughter. (C. 346-361.) Based on the vast array of mitigation evidence presented during the penalty phase coupled with the court’s access to reports and other information not contained in the presentence report, any inadequacies in the presentence report did not constitute plain error. Rule 45A, Ala. R.App. P.; Wilson, 142 So.3d at 816 (citing Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008)). Therefore, Riley is not entitled to any relief.
III.
Riley next argues that the circuit court erred in allowing impermissible prior-bad-act and character evidence to be considered by the jury. Specifically, Riley argues that the State improperly elicited testimony from Officer Chuck Hearn that Officer Hearn recognized Riley on the surveillance video because Officer Hearn had previously approached Riley, who was sitting on a rocker outside of a mall at night, and patted him down. Riley also argues that the State improperly elicited testimony from Michael Owens indicating that Owens believed that Riley was the “kind of person who would not only commit a robbery, but hide the proceeds on someone else’s property because, ‘you know, some people just ain’t right in the head, sir.’ ” (Riley’s brief, at 31, quoting R. 1032.)
Rule 403, Ala. R. Evid., provides: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, *719 waste of time, or needless presentation of cumulative evidence.”
Further,
“[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
Rule 404(b), Ala. R. Evid.
“This court addressed the admissibility of evidence about collateral bad acts in Irvin v. State, 940 So.2d 381, 344-46 (Ala.Crim.App.2005), as follows:
“ ‘ “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). Moreover, “ ‘[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.’ ” Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).
[[Image here]]
“ ‘In Robinson v. State, 528 So.2d 343 (Ala.Crim.App.1986), this Court discussed the purpose of the exclusionary rule, stating:
“ ““ “On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.” ’ Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01 (3d ed.1977). “‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.” ’ Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy’s supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant’s right to a fair trial. ‘ “The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.”’ Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d *720 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
“““If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.’ Saffold v. State, 494 So.2d 164 (Ala.Cr.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App.1984); Scott v. State, 353 So.2d 36 (Ala.Cr.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission.
‘ “Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.” ’ Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra at 468-69. ‘ “ ‘Prejudicial’ is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.” [Citation omitted.] “Of course, ‘prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.’ ” ’ Averette v. State, supra, at 1374.”
“ ‘528 So.2d at 347. See also Hocker v. State, 840 So.2d 197, 213-14 (Ala.Crim.App.2002).’ ”
Baker v. State, 87 So.3d 587, 598-99 (Ala.Crim.App.2009).
A.
Riley first contends that the State improperly elicited testimony from Officer Chuck Hearn regarding Riley’s bad character and propensity to engage in criminal behavior. Riley further contends that this testimony was highly prejudicial, irrelevant, and warrants a reversal. This argument, however, is without merit.
In this case, Officer Hearn testified, over defense counsel’s objection, that he recognized Riley on the surveillance video from Dandy’s because of a previous encounter with Riley outside of an antique store, which occurred approximately five or six weeks before the robbery. Officer Hearn explained that he had been particularly suspicious of “[Riley’s] intentions at the [Belmeade Antique] [M]all” at that time of night and had “patted him down for weapons.” (R. 612-13.) Officer Hearn testified that he had asked Riley for identi- *721 fícation and had run his driver’s license; however, the search had not revealed any outstanding warrants and Riley was not further detained.
When read in context, it is clear that Officer Hearn’s testimony was not offered “to paint Mr. Riley as ... [a] suspicious [person]” (Riley’s brief, at 30), but, instead, was offered for the limited purpose of establishing how Officer Hearn was able to identify Riley as the perpetrator. See Miller v. State, 687 So.2d 1281, 1285 (Ala.Crim.App.1996) (“The officers’ testimony in this case was received to show the reasons for the officers’ actions and how their investigation focused on a suspect.”). Because this testimony was offered to show how investigators developed Riley as a suspect in this case, and not as evidence of “Riley’s bad character or propensity to engage in criminal behavior” (Riley’s brief, at 28), this Court concludes that the admission of this testimony did not violate Rule 404(b), Ala. R. Evid. Windsor v. State, 110 So.3d 876, 880 (Ala.Crim.App.2012) (holding that “the exclusionary rule operates to exclude only evidence of other crimes that is offered as proof of the defendant’s bad character”). Therefore, Riley is not entitled to any relief.
B.
Riley next contends that the State elicited improper opinion testimony from Michael Owens concerning Riley’s bad character and propensity to engage in criminal behavior in violation of Rule 404(b), Ala. R. Evid. Riley did not object to Owens’s testimony at trial; therefore, our review is limited to plain error. Rule 45A, Ala. R.App. P.
During the State’s cross-examination of Owens, the prosecutor asked whether Owens thought the tree house would be a good place to hide things. After Owens responded in the affirmative, the prosecutor asked whether “putting stolen videotapes and whisky” in the tree house sounded like something Riley would do. (R. 1032.) Owens stated that “[he] wouldn’t put it past [Riley,]” “[b]ecause, you know, some people just ain’t right in the head, sir.” (R. 1032.)
Assuming without deciding that the circuit court erred in admitting this particular testimony, that error did not affect the outcome of the proceeding and, thus, was harmless. See Rule 45, Ala. R.App. P.; see also Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000) (“The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.”). In this case, Riley admitted committing the robbery and causing Kirtley’s death, but he maintained that he did not intend to kill Kirtley. Specifically, Riley argued that he merely intended to rob Dandy’s in order to pay his debts. Therefore, any error in the admission of Owens’s testimony relating to Riley’s propensity to commit robbery was harmless and does not entitle Riley to any relief. Rule 45, Ala. R.App. P.; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
IV.
Riley next argues that the State exercised its peremptory strikes in a discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he contends that the prosecution , engaged in racially discriminatory jury selection by peremptorily striking potential jurors J.M. and P.T., thereby removing two of the five qualified minority veniremembers. In both instances, the circuit court indicated that, “ordinarily [it] would say that the [defense] ha[d] not made out a prime facie case” (R. 489), but it asked the State to provide its race-neutral reasons for strik *722 ing these potential jurors “out of an abundance of caution” (R. 489), because this was a capital case. (R. 490.)
In evaluating a Batson claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96-97 [(1986)]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
537 U.S. at 328-29.
Recently, in Thompson v. State, 153 So.3d 84, 125 (Ala.Crim.App.2012), this Court explained:
“ ‘ “After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson [ v. Kentucky ], 476 U.S. [79,] 97, 106 S.Ct. [1712,] 1723 [(1986)]. The State then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986)].”
“ ‘Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“ ‘ “Within the context of Batson, a ‘race-neutral’ explanation ‘means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). ‘In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.’ Id. ‘[Evaluation of the prosecutor’s state of mind based on demeanor and credibility lies “peculiarly within the trial judges’s province.” ’ Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.”
“‘Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).’
“Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010).
“ ‘ “When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.” Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). “A trial court is in a far better position than a reviewing court to rule on issues of credibility.” Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). “Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.” Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘ “Deference to trial court findings on the issue of discriminatory intent *723 makes particular sense in this context because, as we noted in Batson, the finding will ‘largely turn on evaluation of credibility 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.”
“ ‘Hernandez v. New York, 500 U.S. 352, 365 (1991).’
“Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010).
‘“[W]hen more than one reason was given for striking some venire-members, we need only find one race neutral reason among those asserted to find that the strike was race-neutral; we need not address any accompanying reasons that might be suspect. See Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Davis v. State, 555 So.2d 309 (Ala.Cr.App.1989).’
“Zumbado v. State, 615 So.2d 1223, 1231 (Ala.Crim.App.1993). ‘ “So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.” ’ Jackson v. State, 686 So.2d 429, 430 (Ala.Crim.App.1996) (quoting Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993)).
“ ‘Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.’ Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). ‘A determination regarding a moving party’s showing of intent to discrimihate under Batson is “ ‘a pure issue of fact subject to review under a deferential standard.’” Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting Hernandez v. New York, 500 U.S. 352, 365 (1991).’ Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’ Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991).”
153 So.3d at 124.
During the Batson hearing, the circuit court stated that although it agreed that the defense had not made out a prima' facie case of racial discrimination with regard to potential juror J.M., it would still require the State to present its race-neutral reasons out of “an abundance of caution.” (R. 490.) The State subsequently asserted that it struck J.M. because J.M. knew the defendant and codefendant, because J.M. “has a rather extensive criminal history relating to the use and abuse of drugs” (R. 490), and because “either [J.M.] or his son ... was actually an inmate at the Lauderdale County jail at the same time with the defendant.” (R. 490.) The circuit court found the fact that J.M. knew both the defendant and the codefendant to be a valid race-neutral reason. Accordingly, it concluded that there was no Batson violation.
This Court has previously held that “[t]he strike of a potential juror because he knew the appellant or the appellant’s family is a valid race-neutral reason that does not violate Batson v. Kentucky, supra. Brown v. State, 623 So.2d 416 (Ala.Cr.App.1993); Williams v. State, 620 So.2d 82 (Ala.Cr.App.1992).” Carroll v. State, 701 So.2d 47, 52 (Ala.Crim.App.1996). Therefore, this Court agrees with the circuit court’s conclusion that the State provided a facially race-neutral reason for striking J.M. See Zanders v. Alfa Mut. Ins. Co., 628 So.2d 360, 361 (Ala.1993) (“So long as there is a non-racial reason for the challenge, the principles of Batson are not violated.”).
*724 Further, with regard to potential juror P.T., the State asserted that it struck her because: 1) “she was the only person yesterday who requested to be excused who was not excused” (R. 489) and appeared to be “upset” or “disconcerted” throughout the remainder of the selection process (R. 489); and 2) she indicated that she was a victim of domestic violence, but did not respond to any of the questions regarding people who had been victims of violent crimes. (R. 489.) The circuit court found the State’s explanation to be a valid race-neutral reason, stating that, “after observing [P.T.] personally[, it] agree[d] with [the State’s] observation that she desperately d[id] not want to be here and did everything she possibly could to get herself excused.” (R. 489-90.)
“A valid race-neutral reason for striking a juror is because he is inattentive, hostile, or impatient, or is evasive and ambiguous when answering questions. Mitchell v. State, 579 So.2d 45 (Ala.Cr.App.1991), cert. denied, 596 So.2d 954 (Ala.1992).... See Stephens v. State, 580 So.2d 11 (Ala.Cr.App. [(1990)]), affirmed, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138, rehearing denied, 502 U.S. 1000, 112 S.Ct. 625, 116 L.Ed.2d 647 (199[1]) (holding that strike based on juror’s demeanor was valid race-neutral reason and did not violate Batson).”
Brown v. State, 623 So.2d at 419. See also Nesbitt v. State, 531 So.2d 37, 40 (Ala.Crim.App.1987) (holding that the fact that a juror “appeared to be inattentive” was race-neutral reason). Accordingly, this Court agrees with the circuit court that the State provided a facially race-neutral reason for striking P.T. based on her demeanor.
“In the third step of the [Batson v. Kentucky, 476 U.S. 79 (1986),] process, the defendant has the opportunity to offer evidence indicating that the reason or explanation offered by the State for challenging the juror in question is merely a sham or pretext. Ex parte Branch, 526 So.2d [609,] 624 [(Ala.1987) ]. Throughout the Batson process, ‘[t]he defendant maintains at all times ... the ultimate burden of proving intentional discrimination.’ United States v. Houston, 456 F.3d 1328, 1335 (11th Cir.2006) (citing Batson, 476 U.S. at 94 n. 18, 106 S.Ct. 1712).
“In light of both parties’ submissions, the trial court must determine whether the defendant has carried his burden of showing purposeful discrimination. See Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997); Ex parte Branch, 526 So.2d at 624. See also Fletcher v. State, 703 So.2d 432, 435 (Ala.Crim.App.1997) (‘When the defendant challenges as pre-textual the prosecutor’s explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991).’). In making that determination, the trial court must confront the ‘decisive question’ and evaluate the credibility of the prosecution’s explanation, Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), ‘in light of all evidence with a bearing on it,’ Miller-El v. Dretke, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). See also Miller-El v. Cockrell, 537 U.S. at 338-39, 123 S.Ct. 1029; Batson, 476 U.S. at 98, 106 S.Ct. 1712. Cf. Greene v. Upton, 644 F.3d 1145, 1155 (11th Cir.2011) (‘Batson does not require elaborate factual findings. See Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 1035, 154 L.Ed.2d 931 (2003); see also Hightower v. Terry, 459 F.3d 1067, 1072 n. 9 (11th Cir.2006) (“We may therefore make ‘the *725 common sense judgment’ — in light of defense counsel’s failure to rebut the prosecutor’s explanations and the trial court’s ultimate ruling — that the trial court implicitly found the prosecutor’s race-neutral explanations to be credible, thereby completing step three of the Batson inquiry.”)’). In addition, ‘ “[t]he explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor’s other peremptory strikes, and as well, in light of the strength of the pri-ma facie case.” ’ Ex parte Bird, 594 So.2d 676, 683 (Ala.1991) (quoting Gamble v. State, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987)). In other words, all relevant circumstances must be considered in determining whether purposeful discrimination has been shown. See, e.g., Snyder v. Louisiana, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (‘[I]n reviewing a ruling claimed to be a Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted.’).
“ ‘Under Alabama law, the trial judge must “evaluate] the evidence and explanations presented” and “determine whether the explanations are sufficient to overcome the presumption of bias.” Branch, 526 So.2d at 624. “The trial judge cannot merely accept the specific reasons given ... at face value; the judge must consider whether the facially neutral explanations are contrived to avoid admitting the acts of group discrimination.” Id.’
“Smith v. Jackson, 770 So.2d 1068, 1072-73 (Ala.2000).
“The Alabama Supreme Court in Ex parte Branch provided the following examples of the types of evidence the defendant could offer to demonstrate that the stated reason for challenging the juror in question is a sham or pretext:
“ ‘1. The reasons given are not related to the facts of the case.
“ ‘2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
“ ‘3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck.
“ ‘4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors.
“ ‘5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire.
“‘6. “An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.” Slappy [v. State], 503 So.2d [350] at 355 [ (Fla.Dist.Ct.App.1987) ]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.’
“Ex parte Branch, 526 So.2d at 624 (citations omitted).”
Sharp v. State, 151 So.3d 342, 361 (Ala.Crim.App.2010).
In his brief on appeal, Riley argues that the State’s explanations for striking J.M. were clearly pretextual in light of the fact that the State failed to engage in any questioning with regard to its asserted reasons for striking him. Specifically, Riley contends that “although the State asserted that J.M. has an extensive criminal history relating to drug abuse” (Riley’s brief, at 35), J.M.’s responses during voir dire indicated only that he had family members with substance-abuse problems. Riley further argues that the State made no attempt to clarify this discrepancy. Ri *726 ley also argues that the State failed to question J.M. about whether he or his son had been in the Lauderdale County jail at the same time as Riley. Finally, Riley argues that although J.M. indicated that he knew both the defendant and the code-fendant in this case, he later stated that “he would not be uncomfortable sitting on the jury and that he could be a fair juror.” (Riley’s brief, at 35-86; R. 245.) Although Riley contends that the State failed to meaningfully question J.M. with regard to its reasons for striking him, there is no law requiring the State to do so. “It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App. 1994).” Martin v. State, 62 So.3d 1050, 1059-60 (Ala.Crim.App.2010). Because J.M. knew the defendant and the codefen-dant in this case, the circuit court correctly found that the State’s reason was not pre-textual and that no Batson violation had occurred. See Jackson v. State, 686 So.2d 429, 431 (Ala.Crim.App.1996) (“The fact that Juror No. 189 knew the defendant is a valid race-neutral reason for striking that juror.”). Accordingly, Riley’s argument is without merit.
Riley next contends that the State’s reason for striking P.T. should be “viewed with skepticism” in light of its alleged pre-textual reason for striking J.M. (Riley’s brief, at 38) (“Once one of the State’s reasons for striking a potential juror is found to be invalid, the remaining reasons for striking that juror and the reasons for the striking of other jurors become suspect and are subject to greater scrutiny.” (citing Sharp, 151 So.3d at 364)). However, this Court did not find that the State’s reasons for striking J.M. were pretextual. Because the State had a valid race-neutral reason for striking J.M., Riley’s argument with regard to P.T. is also without merit. See Sharp, 151 So.3d at 352 (“ ‘On appeal, a trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. See Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion); id., at 372, 111 S.Ct. 1859 (O’Connor, J., joined by Scalia, J., concurring in judgment)....”’). Accordingly, Riley is not entitled to any relief.
Finally, Riley argues that the State’s use of peremptory strikes to remove 2 of the 5, or 40 percent, of the minority veni-re-members is further evidence of discriminatory intent. However, this Court holds that the State offered valid race-neutral reasons for striking the two jurors at issue; therefore, the mere fact that they constituted 40 percent of the minority veniremembers is insufficient to support a finding of discrimination under Batson. Accordingly, Riley’s argument is without merit.
V.
Riley next argues that the circuit court made several errors in sentencing Riley to death. Specifically, he contends that the circuit court erred in concluding that some of the proffered mitigation evidence was not mitigating.
“The United States Supreme Court’s decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d .973 (1978), requires that a circuit court consider all evidence offered in mitigation when determining a capital defendant’s sentence. However,
“ ‘ “[M]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact. Mikenas [v. State, 407 So.2d 892, 893 (Fla.1981)]; Smith [v. State, 407 So.2d 894 (Fla.1981)].” Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr. *727 App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).’
“Perkins v. State, 808 So.2d 1041 (Ala. Crim.App.1999). ‘ “Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance.” ’ Simmons v. State, 797 So.2d 1134, 1182 (Ala.Crim.App.1999), quoting Wilson v. State, 777 So.2d 856, 893 (Ala.Crim.App.1999). ‘ “While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’” Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989).”
Albarran v. State, 96 So.3d 131, 212-13 (Ala.Crim.App.2011).
In its April 5, 2011, sentencing order, the circuit court listed and addressed the applicability of each statutory and nonstat-utory mitigating circumstance. Specifically, the circuit court stated that it had carefully weighed and considered each of the circumstances Riley offered in mitigation, including his “troubled youth, overly strict parents, serious blows to the head on more than one occasion, a sibling dying in his arms, drug addiction, anxiety for his child’s safety, the love of his family, his mental health diagnosis, [and] abandonment by his biological mother” (C. 361), but it ultimately accepted the jury’s recommendation to sentence Riley to death. The circuit court went on to state that “[a]fter giving full measure and weight to the evidence adduced, and giving careful consideration to the recommendation of the jury, it is the conclusion of the Court that the jury was correct in its determination that the aggravating circumstance outweighs the mitigating circumstances and the Court will follow the recommendation of the jury [by sentencing Riley to death by lethal injection].” (C. 361.)
A.
Initially, Riley contends that the circuit court failed to give substantial weight to his age at the time of the offense. Riley, who was 20 years old at the time the robbery-murder was committed, argues that although the circuit court found that his age was a statutory mitigating circumstance, it did not give his age appropriate weight in light of his difficult upbringing. Specifically, Riley contends that, “[i]n light of the precedent set by Graham [v. Florida, 560 U.S. 48, 67, 130 S.Ct. 2011, 2026 (2010),] and Roper [v. Simmons, 543 U.S. 551, 569-570 (2005)], the trial court should have given substantial weight to [his] young age and the evidence of [his] delayed brain development in making its sentencing determination.” (Riley’s brief, at 40.) However,
“ ‘[i]n keeping with the dictates of the United States Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Crim.App.1983), rev’d on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice ver-sa. Moore v. Balkcom, 716 F.2d 1511 *728 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.’
“Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984), cert. denied, Clisby v. Alabama, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985).”
Morris v. State, 60 So.3d 326, 351 (Ala.Crim.App.2010). See also Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.1991) (“It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer.” (citing Cochran v. State, 500 So.2d 1161 (Ala.Crim.App.1984), aff'd in pertinent part, remanded on other grounds, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala. Crim.App.), aff'd, 500 So.2d 1064 (Ala.1986))).
During the penalty phase of his trial proceedings, Riley presented evidence of a difficult upbringing coupled with a history of substance abuse, alleging that he should not be treated as an adult because of the significant delays in his mental development. After careful consideration, the circuit court found that Riley’s age at the time of the offense was a statutory mitigating circumstance. However, even when coupled with other mitigating circumstances, the circuit court found that the mitigating factors did not outweigh the aggravating circumstance in this particular case. See Calhoun v. State, 932 So.2d 923, 975 (Ala.Crim.App.2005) (“The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance.”). There is nothing in the record to indicate that the circuit court abused its discretion in weighing this circumstance. Therefore, Riley is not entitled to any relief.
B.
Riley further contends that the circuit court erred in failing to find that his long history of substance abuse was a mitigating factor, despite extensive evidence of his drug and alcohol abuse.
During the penalty phase, Riley presented evidence indicating that he began abusing drugs and alcohol when he was around eight years old. Additionally, Riley presented testimony by Dr. Frankie Preston, a licensed psychologist, that he had a “very high probability of having a substance dependence disorder.” (R. 1228, 1221-22.) In addressing this particular mitigating circumstance, the circuit court stated that it had carefully considered Riley’s alleged substance abuse at the time of the offense, but it found that it was not a mitigating circumstance in this ease. Specifically, the circuit court stated:
“The defense also claims Mr. Riley was highly intoxicated on cocaine and/or other illegal drugs at the time of the murder and therefore his actions fall under this mitigating circumstance. In the opinion of several witnesses the defendant exhibited no signs or symptoms of someone who was under the influence of drugs of abuse at the time of this horrific crime. This Court finds this statutory mitigating circumstance does not apply.”
(C. 357.) Additionally, the circuit court also found that Riley’s history of substance abuse was not a mitigating factor, stating:
“[Riley] presented evidence that he is addicted to controlled substances and at the time of the offense was a heavy user *729 of marihuana, narcotics and other illegal drugs. As noted above the evidence does not support the proposition that the defendant acted under the influence of a controlled substance at the time of the crime and the need for money to support a drug habit as motive or excuse for this killing is not, in this Court’s estimation, a mitigating circumstance. Even if it is true that the defendant was under the influence of some intoxicant, the voluntary use of alcohol or other drugs does not constitute a mitigating circumstance.”
(C. 359.) It is clear that the circuit court weighed and carefully considered both the statutory and nonstatutory mitigating circumstances regarding Riley’s past and present substance abuse before finding that neither applied. See Haney, 603 So.2d at 389. Therefore, Riley is not entitled to relief.
C.
Riley next contends that the circuit court erroneously failed to find that he was under the influence of extreme mental or emotional disturbance at the time the offense was committed. Specifically, he contends that the evidence presented during the penalty phase established that: 1) he likely suffered brain injuries as a result of three head traumas; 2) he was the victim of a dysfunctional and violent upbringing; and 3) he suffered from depression. Despite Riley’s proffered mitigating circumstances, the circuit court ultimately found that none of these mitigating circumstances applied.
In its sentencing order, the circuit court specifically stated that it found little to no evidence in support of Riley’s proffered mitigating circumstance that he lacked the ability to conform his conduct to the requirements of the law. Specifically, it noted that the evidence presented tended to show that Riley “committed a robbery to pay off a debt he owed” and that, despite Riley’s claims to the contrary, several witnesses testified that Riley “exhibited no signs or symptoms of someone who was under the influence of drugs ... at the time of this horrific crime.” (C. 357.) Therefore, the circuit court concluded that the statutory mitigating circumstance enumerated in § 13A-5-51(2), Ala.Code 1975, did not apply.
It is clear that the circuit court properly considered each of the statutory and non-statutory mitigating circumstances before concluding that the aggravating circumstance outweighed the mitigating circumstances in this case; therefore, Riley is not entitled to any relief.
VI.
Riley next argues that the circuit court erred in allowing the State to introduce highly prejudicial victim-impact evidence in rebuttal during the sentencing phase.[4] Riley did not object to the admission of this evidence at trial; therefore, this Court’s review is limited to plain error. Rule 45A, Ala. R.App. P.
During the penalty phase of Riley’s trial, the State declined to present any testimony during its case-in-chief, and, instead, it simply incorporated the evidence from the guilt phase into the penalty phase. The defense then presented mitigation evidence regarding Riley’s troubled upbringing, his mother’s abandonment, his infant *730 sibling’s death, his multiple head traumas, his history of substance abuse, and his mental-health issues. Afterwards, the circuit court permitted the State to offer, in rebuttal, the testimony of three of the victim’s family members, including his mother, Bonnie Kirtley. Riley argues, on appeal, that Bonnie Kirtley’s statement was both improper and highly prejudicial. He further contends that the prejudicial effect of her testimony was “heightened by the trial court’s failure to properly instruct the jury on how to weigh this evidence in order to ensure the careful, non-arbitrary application of the death penalty.” (Riley’s brief, at 46-17.)
Riley specifically challenges the following excerpt from Bonnie Kirtley’s prepared statement:
“Mr. Riley murdered my son. It was on the videotape in the store. He was in his right mind. He had planned all along to do such a horrible thing. All the evidence is there. It is obvious. Scott even saved the life of a customer by waiting on him and sending him away when he easily could have said we are being held up. No. He waited.”
(R. 1299.) She then concluded her testimony by asking the court to “[p]lease ... bring justice for Scott Michael Kirtley.” (R. ,1301.) Riley argues that this testimony “clearly violated state and federal law which prohibit[s] the introduction of evidence of the victim’s family members’ characterizations or opinions about the defendant, the crime, or their beliefs as to an appropriate sentence.” (Riley’s brief, at 46.)
Assuming without deciding that Bonnie Kirtley’s statement was improperly admitted, any error did not rise to the level of plain error. Rule 45A, Ala. R.App. P.
“It is settled law that testimony by relatives of a victim concerning the appropriate sentence is not properly admissible in a death penalty case as victim-impact testimony. Bryant v. State, 288 Ga. 876, 895-898(15)(a), 708 S.E.2d 362 (2011). See also Booth v. Maryland, 482 U.S. 496, 508-509(II)(B), 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (overruled on other grounds by Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)); Stinski v. State, 286 Ga. 839, 854(55), 691 S.E.2d 854 (2010). For that reason, we will assume that trial counsel performed unreasonably when they failed to object to these statements. But we cannot conclude that, if a timely objection to these statements had been interposed, a reasonable likelihood exists that the outcome of the sentencing phase would have been different. ...”
State v. Worsley, 293 Ga. 315, 328, 745 S.E.2d 617, 627 (2013).
When read in context, it is clear that Bonnie Kirtley’s comments were, for the most part, mere pleas for justice and not an improper request for the jury to recommend the death penalty. Further, much of Bonnie Kirtley’s testimony is a description of what can be seen on the surveillance video, which depicted Riley pulling a gun. on Kirtley, robbing him, and then calmly backing away and concealing his weapon as a customer enters the store. (State’s exhibit 37.) The video then shows Riley allowing the customer to leave before forcing Kirtley into a back room, where he shot Kirtley three times. Additionally, Bonnie Kirtley’s “statements, though improper, did not consist of especially heated rhetoric and do not appear to have been especially inflammatory. See Stinski [v. State], 286 Ga. [839,] 854(55), 691 S.E.2d 854 [ (2010) ] (finding improper characterization of crimes as ‘brutal’ and ‘horrible act[s]’ harmless beyond a reasonable doubt).” Worsley, 293 Ga. at 329, 745 S.E.2d at 627-28. Because the jury had already found Riley guilty of capital mur *731 der when they heard Bonnie Kirtley’s statement, any error in the admission of this testimony was harmless. Rule 45, Ala. R.App. P.; Stinski, 286 Ga. at 854, 691 S.E.2d at 871 (finding “several minor” violations of limits of victim-impact testimony harmless beyond a reasonable doubt when violations merely concerned obviously and indisputably accurate, but nonetheless improper, characterizations of the crime). Accordingly, Riley is not entitled to any relief.
VII.
Riley next argues that the circuit court erred in permitting the prosecutor to inflame the passions of the jury during his guilt-phase closing arguments by encouraging them to “follow the law[,]” “do [their] duty[,]” and get justice for the victim’s family by convicting Riley of capital murder. (R. 1180.) Riley did not object to these statements at trial; therefore, our review is limited to plain error. Rule 45A, Ala. R.App. P.
“ ‘ “In judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ” Bankhead [v. State], 585 So.2d [97,] 107 [(Ala.Crim.App.1989),] quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.” Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735. So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead, 585 So.2d at 106. “Questions of the propriety of argument of counsel are largely within the trial court’s discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.” Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.’
“Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, ‘ “[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” ’ Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985)).”
Wilson v. State, 142 So.3d at 776 (opinion on return to remand).
During his guilt-phase closing arguments, the prosecutor stated:
“The Kirtley family is not here for your sympathy. They want justice. Fortunately for them they have a wealth of great friends that support them and whose hearts go out to their family. But what we want you to do is follow the law, follow the evidence and do what your oath as a juror demands that you do, and that’s convict him of what he’s charged with because that’s what he’s *732 guilty of. And we put our trust in each one of you to do your duty with that and we know, you will.”
(R. 1180.) The prosecutor again appealed to the jury for justice in his penalty-phase closing arguments, stating: “And I can’t emphasize to you enough what your role is to the extent you can get some justice for this family. From what all they have been through, through no fault of their own, you’ve got the power to do that and I urge you to do your duty.” (R. 1320.)
Reviewing the arguments of counsel in context, this Court finds that the prosecutor’s comments were nothing more than proper pleas for justice. See Minor v. State, 914 So.2d 372, 421 (Ala.Crim.App.2004) (“ ‘There is no impropriety in a prosecutor’s appeal to the jury for justice and to properly perform its duty.’” (quoting Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998))). Further, even if the comments were improper, they did not “1 “so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.” ’ ” Sneed v. State, 1 So.3d at 138 (quoting Darden v. Wainwright, 477 U.S. at 181, quoting in turn Donnelly v. DeChristoforo, 416 U.S. at 643)). See also McGowan v. State, 990 So.2d 931, 977 (Ala.Crim.App.2003) (“Based on the foregoing, we find that the prosecutor did not commit plain error by his final remarks about the jury’s oath. He did not, ‘in exhorting, the jury to [honor its oath] ... imply that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court’s instructions on the law.’ ” (quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala. Crim.App.1990))). Therefore, this Court holds that no error, much less plain error, occurred, and Riley is not entitled to any relief.
VIII.
Riley next argues that the circuit court erred in failing to conduct a proper inquiry regarding his allegations of potential juror misconduct. This argument, however, is without merit.
While taking a break during the State’s case-in-chief, Riley’s father, David Riley, Sr., overheard Juror D.H. on her cellular telephone telling someone that she was “unlucky to have been,picked on this jury, [or] something to that effect.” (R. 863.) Defense counsel immediately informed the circuit court of the alleged misconduct and asked that D.H. “be removed and an alternate set up.” (R. 864.) At no time, however, did defense counsel ask the court to individually voir dire the juror at issue or move for a mistrial. Based on the limited information provided, the circuit court opined that the juror in question was most likely “not talking about the case but the fact that they’re on jury service.” (R. 864.) The circuit court then went on to state that jurors “certainly are not prohibited from telling people they are on a jury, and [he] bet none of them think they’re lucky to be on this jury.” (R. 864.) Defense counsel responded that he understood, and the circuit court offered to remove the juror and replace her with an alternate. The State then suggested that the less drastic remedy would be for the circuit court to issue a cautionary instruction to the panel and to question the juror before replacing her with the alternate. The circuit court then reiterated its previous ruling that “[i]f the defendant wants [D.H.] to be an alternate, the defendant w[ould] get that relief at the end of the testimony.” (R. 865.) Defense counsel subsequently agreed with the State that a cautionary instruction would be appropriate, and the circuit court instructed the jury as follows:
*733 “Ladies and gentlemen, before we begin the cross-examination I want to just reemphasize an instruction that I have given you several times up to this point because it is so vitally important. Please, do not discuss this case. Don’t discuss it among yourselves. Don’t discuss it with anybody else. Don’t make phone calls and discuss it over the phone. Don’t read articles about it. Don’t make any kind of independent investigation about it. Don’t give anybody any reason to criticize your objectivity. Please, keep that in mind.”
(R. 865-66.) The circuit court then reiterated that when the case came to an end and it was time to release the two alternates, D.H. would be identified as an alternate at the defense’s request. Both parties appeared to agree with the circuit court’s handling of the situation. Following closing arguments, the circuit court again asked defense counsel whether Riley had made a decision regarding the alternate juror. Defense counsel responded that he had spoken with Riley that morning and that “he d[id] not wish to seat the alternate so leave the original two alternates.” (R. 1180.) As a result, the circuit court released the two original alternates.
Because there was no evidence indicating that D.H. committed any misconduct and because Riley was given the opportunity to replace D.H. with an alternate, but ultimately chose not to do so, Riley has not met his burden to show that the manner in which the circuit court handled the situation rose to the level of plain error. Rule 45A, Ala. R.App. P.; Ex parte Walker, 972 So.2d 737, 752 (Ala.2007) (recognizing that the appellant has the burden to establish that an issue rises to the level of plain error). Accordingly, Riley is not entitled to any relief.
IX.
Riley next argues that extensive pretrial publicity and excessive media coverage undermined his rights to a fair trial, due process, and a reliable sentencing proceeding. Specifically, Riley contends that the circuit court failed to ensure that he received a fair trial free from outside influence by improperly denying his motions: 1) for funds to poll potential jurors; 2) to seal the court file and close pretrial proceedings; and 3) for a change of venue.
“‘“A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury veni-re. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).”
“ ‘Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).’
“Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). ‘The mere fact that publicity and media attention were widespread is not sufficient. to warrant a change of venue. Rather, Ex parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.’ Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992). ‘ “Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.” ’ Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
*734 “ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 833, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).’
“Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).”
Brown v. State, 74 So.3d 984, 1030-31 (Ala.Crim.App.2010).
A.
Riley initially argues that the circuit court erred in denying his motion for funds to poll potential jurors “about their knowledge of the case, opinions already formed about guilt or innocence, and opinions already formed about ultimate punishment.” (C. 459.) In denying the motion, the circuit court explained that “[it would] find out whether we can get a fair jury when we get to voir dire.” (R. 103.) It is well settled that
“[t]he most important way to guard against the effects of pretrial publicity is to conduct an extensive examination of the jurors during jury selection. See LaFave and Israel, 2 Criminal Procedure § 22.2 (1984). ‘The proper way to ascertain whether adverse publicity may have biased the prospective jury is through the voir dire examination.’ Thomas v. State, 452 So.2d 899, 902 (Ala.Cr.App.1984). See also Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991).”
Madden v. State, 628 So.2d 1050, 1051-52 (Ala.Crim.App.1993).
The record reveals that the circuit court conducted a thorough voir dire and individual voir dire examination of all venire-members who indicated that they had previously heard about the case. Further, the circuit court also provided the prosecution and the defense an opportunity to ask additional questions to any juror who had preexisting knowledge of the case. Potential jurors who indicated that they could not be impartial were later removed for cause. Because Riley was allowed to discern who was, and to what extent they were, exposed to pretrial publicity, the circuit court did not err in denying Riley’s motion for funds to poll potential jurors.
B.
Riley next argues that the circuit court erred in denying his motion to seal his court file and to close pretrial proceedings on the ground that the media coverage of his case had been “inaccurate, false, speculative, and inflammatory.” (C. 241.)
Before trial, Riley filed a motion to seal the court file and to close pretrial proceedings arguing that “there is ‘a substantial probability that [his] right to a fair trial would be prejudiced by publicity that ... closure would prevent.’ ” (C. 110, quoting Ex parte Consolidated Publ’g Co., 601 So.2d 423, 434 (Ala.1992)). Riley further argued that there “are no reasonable alternatives to closure that would be adequate to protect [his] rights” and that “[t]he closure order ... [sought was] narrowly tailored to serve these interests.” (C. 111.) Riley’s unsubstantiated and unsupported claims were insufficient to warrant sealing the court file or closing the pretrial proceedings in this case. There *735 fore, the circuit court did not err in denying Riley’s motion.
“ ‘The closure of a trial ... implicates both the defendant’s Sixth Amendment right to a public trial and the public’s First Amendment right of access.’ Project, Twenty-Second, Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo. L.J. 853, 1888 (1993). See Ex parte Consolidated Pub. Co., 601 So.2d 423, 426-28 (Ala.), cert. denied, 506 U.S. 1024, 113 S.Ct. 665, 121 L.Ed.2d 590 (1992), briefly summarizing the development of the law in this area. The United States Supreme Court has clearly established that the public, which includes the press, has a First Amendment right of access to the trial of a criminal case. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980). This right is related to, but independent of, an accused’s Sixth Amendment right to a public trial, ‘the common concern being the assurance of fairness.’ Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) (hereinafter ‘Press-Enterprise II ’). The Supreme Court has held that the public’s right of access extends to jury voir dire, Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984) (hereinafter ‘Press-Enterprise I’), and to preliminary hearings, Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. at 2741.
“In determining whether a First Amendment right of access applies to a particular proceeding, the United States Supreme Court has utilized a two-part analysis, taking into ‘consider[ation] whether the place and process have historically been open to the press and general public’ and ‘whether public access plays a significant positive role in the functioning of the particular process in question.’ Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. at 2740. Where these questions are answered in the affirmative, the ‘First Amendment right of public access attaches.’ Id. at 9, 106 S.Ct. at 2740.
[[Image here]]
“It has been noted that while Press-Enterprise II ‘dealt only with the preliminary hearing, the Court’s reasoning appears applicable to a wide range of pretrial hearings, including bail hearings, suppression hearings, and the evi-dentiary hearings held on various motions (e.g., change of venue).’ 2 W. LaFave & J. Israel, Criminal Procedure § 22.1 at 271 (2d ed. Supp.1991). In Ex parte Consolidated Pub. Co., 601 So.2d 423, 428-33 (Ala.), cert. denied, 506 U.S. 1024, 113 S.Ct. 665, 121 L.Ed.2d 590 (1992), the Alabama Supreme Court was presented with the question of whether the public and press had a right of access to pretrial proceedings. Applying the two-part analysis developed by the United States Supreme Court,’ our Supreme Court concluded that the ‘First Amendment right of access to criminal proceedings described in Press-Enterprise II applies to pretrial hearings.’ 601 So.2d at 433. The Court also determined that the ‘First Amendment right of access to criminal proceedings applies to the court file [of those proceedings].’ Id. Accord State v. Widenhouse, 556 So.2d 187, 189-90 (La.App.1990) (‘the qualified constitutional right of access ... extends to documents filed in connection with the pretrial motions in criminal proceedings’).
“While it is clear from the cases discussed above that the public and, derivatively, the press have a constitutional *736 right to attend criminal trials, including pretrial proceedings, this. right ‘is not absolute.’ Globe, 457 U.S. at 606, 102 S.Ct. at 2620. Accord Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. at 2740. In fact, access to criminal trial proceedings is generally referred to as a ‘qualified right.’ E.g., Waller v. Georgia, 467 U.S. 39, 44, 104 S.Ct. 2210, 2214, 81 L.Ed.2d 31 (1984); Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. at 2741; Ex parte Consolidated Pub. Co., 601 So.2d at 433. The right of access is qualified because it ‘may be overcome ... by an overriding interest ... essential to preserve higher values.’ Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. at 824, quoted in Press-Enterprise II, 478 U.S. at 9, 106 S.Ct. at 2741. Interests that may override the public’s right to access include ‘the defendant’s right to a fair trial,’ Waller v. Georgia, 467 U.S. at 45, 104 S.Ct. at 2215, and ‘compelling governmental interest[s],’ Globe, 457 U.S. at 607, 102 S.Ct. at 2620, such as ‘the government’s interest in inhibiting disclosure of sensitive information,’ Waller v. Georgia, 467 U.S. at 45, 104 S.Ct. at 2215; the government’s interest in protecting ‘victims of sex crimes from [the] further trauma and embarrassment’ of testifying in public, Globe, 457 U.S. at 607, 102 S.Ct. at 2620, see also Press-Enterprise II, 478 U.S. at 9 n. 2, 106 S.Ct. at 2741 n. 2, Lee v. State, 529 So.2d 181, 182-83 (Miss.1988); and the government’s interest in protecting its witnesses from physical harm, see People v. Brown, 178 A.D.2d 280, 577 N.Y.S.2d 380 (1991) (where police ‘officer testified that he was then active as an undercover officer in the geographical area of defendant’s arrest, and was involved in ongoing undercover narcotic investigations!,] ... the jeopardy to the undercover officer’s effectiveness and his-safety was properly determined to be an overriding interest’), appeal denied, 79 N.Y.2d 918, 582 N.Y.S.2d 78, 590 N.E.2d 1206 (1992). Additionally, ‘protecting the privacy of persons not before the court’ may override the public’s right of access. Waller v. Georgia, 467 U.S. at 48, 104 S.Ct. at 2216. See Post-Newsweek Stations v. Doe, 612 So.2d 549 (Fla.1992) (privacy interests of third parties named in prostitute’s client list did not outweigh public’s right of access in prosecution of prostitute).
“It is clear that there may be any number of rights or interests implicated at a criminal trial or pretrial proceeding and that these rights or interests may be advanced by the defendant, the prosecution, the public at large, or third persons who are not before the court. These rights and interests need not necessarily be conflicting. Where they are, however, ‘[t]he court’s task is to balance paramount constitutional values rather than to abrogate one right or the other.’ State v. Tallman, 148 Vt. 465, 537 A.2d 422, 427 (1987). The trial court must take ‘special care’ in balancing these interests. Waller v. Georgia, 467 U.S. at 45, 104 S.Ct. at 2215. While each case must be decided on its own facts, there is a presumption in favor of openness. See Richmond Newspapers, 448 U.S. at 573, 100 S.Ct. at 2825. Cf. The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1512 (11th Cir.1991), and cases cited therein (discussing presumption in favor of openness in the context of prior restraintD ]. The trial court may order closure only when ‘the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced.’ Press-Enterprise II, 478 U.S. at 7, 106 S.Ct. at 2739.
“ ‘Generally, trials are open to the public. However, public access must be balanced with the effect on the parties. Newman v. Graddick, 696 F.2d 796 (11th Cir.1983). Only in spe *737 cial circumstances' or where justice requires, are proceedings limited or completely closed to the public.’
“Ex parte Balogun, 516 So.2d 606, 610 (Ala.1987).”
Ex parte Birmingham News Co., 624 So.2d 1117, 1123-26 (Ala.Crim.App.1993) (footnotes omitted). Further,
“[r]eview of a trial court’s sealing of the record or documents is clearly subject to review for abuse of discretion. Holland v. Eads, 614 So.2d 1012, 1014 (Ala.1993); In re Application and Affidavit for a Search Warrant, 923 F.2d 324, 326 (4th Cir.), cert. denied, 500 U.S. 944, 111 S.Ct. 2243, 114 L.Ed.2d 484 (1991). See also Wilson v. American Motors Corp., 759 F.2d 1568, 1571 (11th Cir.1985) (where parties presented ‘no legally sufficient reasons for the closure of the record[,] ... the sealing of the record was an abuse of discretion’). Because closure of proceedings and sealing of court records are related matters implicating similar interests, we deem it appropriate to apply the same standard of review to both.”
Ex parte Birmingham News, 624 So.2d at 1126.
To the extent that Riley argues that the court file should have been sealed, his argument is both unpersuasive and without merit. In Holland v. Eads, 614 So.2d 1012 (Ala.1993), the Alabama Supreme Court set out the following standards concerning a motion to seal:
“In light of the public policy in favor of public access and the prevailing analysis of this presumption in most American courts, we hold that if a motion to seal is filed, then the trial court shall conduct a hearing. The trial court shall not seal court records except upon a written finding that the moving party has proved by clear and convincing evidence that the information contained in the document sought to be sealed:
“(1) constitutes a trade secret or other confidential commercial research or information; see Brown & Williamson Tobacco Corp. [v. F.T.C., 710 F.2d 1165], 1179 [ (6th Cir.1983) ]; or
“(2) is a matter of national security; see Barron [v. Florida Freedom Newspapers, Inc., 531 So.2d 113], 118 [ (Fla.1988) ]; or
“(3) promotes scandal or defamation; or
“(4) pertains to wholly private family matters, such as divorce, child custody, or adoption; see [Nixon v.] Warner, [435 U.S. 589 (1978)]; [Ex parte] Balogun, [516 So.2d 606 (Ala.1987)]; Holcombe v. State ex rel. Chandler, 240 Ala. 590, 200 So. 739 (1941); or
“(5) poses a serious threat of harassment, exploitation, physical intrusion, or other, particularized harm to the parties to the action; or
“(6) poses the potential for harm to third persons not parties to the litigation.
“If any one of the above criteria is satisfied, then the trial court may seal the record, or any part of the record, before trial, during trial, or even after a verdict has been reached.”
Id., at 1016. In applying these factors to the present case, this Court • finds that Riley has failed to establish by clear and convincing evidence that the records at issue ought to have been sealed. Therefore, this Court finds no error in the circuit court’s refusal to seal the court file.
Likewise, the circuit court also properly denied Riley’s motion to close pretrial proceedings. This Court has reviewed Riley’s claims and finds that he has failed to meet his burden to establish “an overriding interest” sufficient to overcome the public’s right of access. Press-Enterprise Co. v. Superior Court of California, Riverside *738 Cnty., 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Accordingly, this Court finds that Riley “presented ‘no legally sufficient reasons for the closure of the record.”’ Wilson, 759 F.2d at 1571. Thus, the circuit court did not abuse its discretion in denying Riley’s motion to close pretrial proceedings.
C.
Riley next contends that the circuit court erred in denying his motion for a change of venue on the ground that there was extensive and prejudicial pretrial publicity. Specifically, he contends that the extensive media coverage of this case unquestionably “ ‘saturated the community’ ” and thereby tainted the jury pool in Lauderdale County. (Riley’s brief, at 54-56, quoting Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir.1985)).
Before trial, Riley filed a motion for change of venue alleging that “[a]t each stage of the criminal proceedings against [him], the newspapers, broadcast media, and other forms of communication in Lauderdale County and neighboring counties gave the case such extensive publicity, and in a manner so prejudicial to Mr. Riley, that [it] is impossible to conduct a fair trial by an impartial and unbiased jury in this county.” (C. 143-44.) On appeal, he contends:
“Because Lauderdale County has a population of only approximately 88,550, the risk of prejudice to Mr. Riley was greatly increased. See Skilling v. United States, [561 U.S. 358, 381,] 130 S.Ct. 2896, 2915 (2010) (potential for prejudice from media exposure is higher where jury is drawn from smaller pool of people). That the news coverage of this offense saturated the community is without question.
“The Times Daily, which has a circulation of 28,584, ran thirty-six stories about Mr. Riley’s arrest, trial, conviction, sentence, the reversal of his conviction, and his new trial. Many of these stories were on the front page of the newspaper and featured large photographs of Mr. Riley in handcuffs and a jail uniform, as well as details about Mr. Riley’s prior burglary conviction. (See e.g. C. 201, 381, 390, 397, 399-400.) The reversal of Mr. Riley’s conviction also made front page news in December 2009. (C. 418.)
“Similarly, the local ABC, NBC, and CBS affiliates, which have a viewership ranging from 40,000 to 68,000 in the Shoals area (C. 145), ran 177 segments about the murder at Dandy’s Package Store. (C. 152-197.) Of those, at least 153 mentioned Mr. Riley’s alleged involvement. The content of those news stories, which ran from January 2005 until April 2010, covered each stage of the trials of both Mr. Riley and Dewon Jones, as well as the reversal of Mr. Riley’s conviction. News of Mr. Riley’s conviction and death sentence was also widely reported, which had enormous capacity to bias jurors. See Hammond v. State, 776 So.2d 884, 889-93 (Ala. Crim.App.1998). Additionally, news stories reporting on the reversal of Mr. Riley’s first conviction stated the appellate ruling hinged on a ‘technicality,’ which likely furthered community sentiment that Mr. Riley was guilty and ought to be re-convicted. (C. 152-53.)”
(Riley’s brief, at 54-56 (footnotes omitted)). Riley further argues that by denying his motion for a change of venue, the circuit court “failfed] to ensure his right to a fair trial free from outside influence^] denied his rights to due process, a fair trial, and a reliable sentencing proceeding.” (Riley’s brief, at 56.)
This Court has explained:
“ ‘The right of an accused to be tried by a fair and impartial jury is guaranteed by the Sixth Amendment *739 of the United States Constitution which states that “[i]n all. criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury....” Article I, § 6 of the Alabama Constitution of 1901 states, in part: “That in all criminal prosecutions, the accused has a right to ... a speedy, public trial, by an impartial jury....”
“ ‘The Supreme Court of the United States has held that if an accused can not obtain an impartial jury in the district where he is being tried then the court should transfer the case to another district where the jurors are free of bias. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). This guarantee has also been codified in this state in Ala. Code 1975, § 15-2-20. Rule 10.1, A.R. Cr. P. is to the same effect.’
“Hunt v. State, 642 So.2d 999, 1042 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
“ ‘When requesting a change of venue, “[t]he burden of proof is on the defendant to ‘show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.’ ” ’ Jackson v. State, 791 So.2d 979, 995 (Ala.Crim.App.2000) (quoting Hardy v. State, 804 So.2d 247, 293 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000) (quoting in turn Rule 10.1(b), Ala. R.Crim. P.)).
“‘[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.’
“Nelson v. State, 440 So.2d 1130, 1132 (Ala.Crim.App.1983). See also Joiner v. State, 651 So.2d 1155, 1156 (Ala.Crim.App.1994) (‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire.’). Thus, ‘[t]he trial court’s ruling on a motion for a change of venue will not be reversed absent an abuse of discretion.’ Buskey v. State, 650 So.2d 605, 610 (Ala.Crim.App.1994). See also Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985) (‘Absent a showing of abuse of discretion, a trial court’s ruling on a motion for change of venue will not be overturned.’).
“ ‘In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated “actual prejudice” against him on the part of the jurors; 2) when there is “presumed prejudice” resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
“ ‘The “actual prejudice” standard is defined as follows:
“ ‘ “To find the existence of actual prejudice, two basic prerequisites *740 must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and ‘rendered] a verdict based on the evidence presented in court.’ Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].”
“ ‘Coleman v. Zant, 708 F.2d at 544.
. Th[e “presumed prejudice”] standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: “Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.” 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“ ‘In determining whether the “presumed prejudice” standard exists the trial court should look at “the totality of the surrounding facts.” Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is “rarely” applicable, and is reserved for only “extreme situations.” Coleman v. Kemp, 778 F.2d at 1537. “In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.” Coleman v. Kemp, 778 F.2d at 1490.’
“Hunt, 642 So.2d at 1042^3.
“ ‘In order to show community saturation [under the “presumed prejudice” standard], the appellant must show more than the fact “that a case generates even widespread publicity.” Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). “ ‘Newspaper articles alone would not necessitate' a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or den-unciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].’ ” Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).’
“Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993). Thus, ‘ “[t]o justify a presumption of prejudice ..., the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.” ’ Billups v. State, 86 So.3d 1032, 1069 (Ala.Crim.App.2009) (emphasis omitted) (quoting United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990)). ‘Moreover, “the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive.” ’ Carruth v. State, 927 So.2d 866, 876 (Ala.Crim.App.2005) (quoting Ex parte Travis, 776 So.2d 874, 878 (Ala.2000)).”
*741 McCray v. State, 88 So.3d 1, 68-70 (Ala.Crim.App.2010).
In this case, Riley does not argue actual prejudice; instead, he argues only presumed prejudice. He, however, failed to establish that the pretrial publicity surrounding this offense was so extensive and sensational in nature that a fair and impartial trial was impossible in Lauderdale County. This Court has thoroughly reviewed the evidence presented by Riley and finds that the articles and news broadcasts complained of were largely factual and objective, as opposed to accusatory, sensational, or inflammatory. Although one newspaper article specifically hsted Riley’s prior burglary conviction as well as the reversal of his previous capital-murder conviction, the mere fact that media coverage references a defendant’s criminal history is not sufficient, by itself, to satisfy the presumed-prejudice standard. See, e.g., Jones v. State, 43 So.3d 1258 (Ala. Crim.App.2007). Accordingly, this Court cannot say, based on the record before it, that the media coverage in this case so inflamed or saturated the community as to create one of the “extreme situations” that warrant a presumption of prejudice.[5] Therefore, we do not find that the circuit court abused its discretion in denying Riley’s motion for a change of venue.
X.
Riley next argues that the State failed to establish a proper chain of custody with regard to the bloodstained jeans he was wearing at the time of his arrest. Specifically, Riley challenges the admission of the blue jeans because they did not contain a bar code or other identifying marks when Investigator Susanna Taylor removed them from the evidence vault. (Riley’s brief, at 57-59.) Riley further alleges that this evidence “was critical to a central issue at trial: whether [he] had the specific intent for capital murder,” because “the State relied on the location of the blood stains on -the jeans — below the knee — to argue that the shooting was ‘execution style,’ and therefore, intentional.” (Riley’s brief, at 59; R. 1179.)
“ ‘In Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), the Alabama Supreme Court discussed the requirements for establishing the chain of custody:
‘““Ex parte Holton, 590 So.2d 918 (Ala.1991), sets forth the legal analysis to be applied in determining if a proper chain of custody has been established:
“ ‘ “ ‘The chain of custody is composed of “finks.” A “fink” is anyone who handled the item. The State must identify each fink from the time the item was seized. In order to show a proper chain of custody, the record must show each fink and also the following with regard to each fink’s possession of the item: “(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.” Im-winklereid, The Identification of Original, Real Evidence, 61 Mil. L.Rev. 145,159 (1973).
“ ‘ “ ‘If the State or any other proponent of demonstrative evi *742 dence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a “missing” link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the “link,” as to one or more criteria or as to one or more links, the result is a “weak” link. When the link is “weak,” a question of credibility and weight is presented, not one of admissibility.’
“ ‘ “590 So.2d at 920. While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State, 650 So.2d 603 (Ala Crim.App.1994).”
‘“680 So.2d at 918. ‘“In order to establish a proper chain, the State must show to a “reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.” ’ ” Ingram v. State, 779 So.2d 1225, 1254 (Ala.Crim.App.1999) (quoting Ex parte Holton, 590 So.2d at 919-20 (citation omitted in Holton)), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). “[Ejvidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item.” Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim.App.1994); see also Ingram v. State, 779 So.2d at 1254. Additionally, “‘[cjhain of custody requirements do not apply with the same force to items of evidence which are unique ‘ and identifiable in themselves.’ ” Ex parte Scott, 728 So.2d 172, 182 (Ala.1998) (quoting Magwood v. State, 494 So.2d 124, 144 (Ala.Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)), cert. denied, 528 U.S. 831, 120 S.Ct. 87 (1999).
[[Image here]]
“ ‘ “Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.”
“ ‘§ 12-21-13, Ala.Code 1975. Therefore, any question as to the adequacy of the safeguarding and handling of the evidence did not go to its admissibility. Rather, it went to the weight the jury would assign to the evidence.’
“Martin v. State, 931 So.2d 736, 748-49 (Ala.Crim.App.2003), aff'd in part, rev’d in part on unrelated ground, 931 So.2d 759 (Ala.2004).”
Reynolds v. State, 114 So.3d 61, 118-19 (Ala.Crim.App.2010). Finally,
“ ‘[tjhe purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with, the evidence.’ Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Crim.App.1992); Smith v. State, 583 So.2d 990 (Ala.Crim.App.1991), cert. denied, 583 So.2d 993 (Ala.1991). Moreover, the evidence need not negate the remotest possibility *743 of substitution, alteration, or tampering, but instead must prove to a reasonable probability that the item is the same as it was at the beginning of the chain. Harrell, at 437; Ex parte Williams, 548 So.2d 518 (Ala.1989). Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim.App.1990), rev’d, 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Crim.App.), appeal after remand, 591 So.2d at 149 (Ala.Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984).”
Slaton v. State, 680 So.2d 879, 893 (Ala.Crim.App.1995).
At trial, Officer Jeff Redcross testified that, after questioning Riley, he collected the blood-spattered jeans that Riley was wearing at the time of his arrest and secured them in a bag. Once the item was bagged, Officer Redcross returned the blue jeans to the interrogation room where Investigator Bob Freeman “took them and logged them in the evidence vault.” (R. 723-24.) Officer Redcross testified that he did not alter or change this evidence in any way.
Investigator Freeman testified that he received the blue jeans at issue from Officer Redcross and placed them inside a secured bag in the evidence vault. Investigator Freeman testified that he did not do anything to change or alter this evidence while it was in his custody and control. He further stated that, to his knowledge, the jeans remained secure inside the vault until Investigator Taylor assumed custody as evidence technician.
Investigator Taylor testified that, after Investigator Freeman’s retirement, she assumed custody and control of the evidence vault. Officer Redcross met Investigator Taylor at the evidence vault where he “visually inspected [the blue jeans] and ascertained that th[ey] [were] part of the Riley case.” (R. 725.) Officer Redcross further testified that the blue jeans presented at trial were the same pair that he had removed from Riley during the early morning hours of January 11, 2005. As part of her duties as the evidence technician in this case, Investigator Taylor reviewed all of Investigator Freeman’s files and evidence receipts. The files established that the evidence was collected by Officer Red-cross and given to Investigator Freeman, who secured it in the vault before his retirement. Investigator Taylor testified that this “chain ... was consistent with [her] finding of the blue jeans [in the vault].” (R. 667.)
During cross-examination, Investigator Taylor was asked to read a supplemental report written shortly after she took over as evidence technician, which stated:
“On July 5, 2005[,] I was working in the Florence Police Department evidence vault and there [were] five, brown Foodland bags that did not have a bar code sticker on them. These bags were in the vault near the counter on the floor. These bags had been secured in the evidence vault by Investigator Bob Freeman prior to my temporary assignment to the vault and the following evidence was noted inside the five bags: [Number 1,] one pair of Authentic Jean-swear jeans, 36 by 32. Number 2, one Michigan hat. Number 3, one New River brown leather jacket. Number 4, one Sprint cell phone. Number 5, one pair of boxer type underwear. Number 6, one pair of socks. Number 7, one blue Active Wear football shirt, extra, extra large.
[[Image here]]
“And I contacted Investigator Bob Freeman and asked him what cases the evidence belonged to. He advised that he thought the evidence was from the capital murder case in which Scott Kirt- *744 ley was killed. On today’s date July 11, 2005[,] I asked Investigator Jeff Red-cross to accompany me to this evidence vault in order for him to see if he could identify the evidence ... [a]s being that from the murder case.”
(R. 663-64.)
Investigator Freeman’s files indicated that several items should be sent to the DFS for testing, including the blood-spattered blue jeans Riley was wearing at the time of his arrest. On July 11, 2005, Investigator Taylor took the blue jeans and several other items to the DFS for testing. Investigator Taylor testified that she personally took the sealed container from the vault and delivered it to the DFS, where she “filled out the Huntsville lab request form specifically asking for the blue jeans to be tested for blood.” (R. 658.) The evidence was then entered into the DFS’s database and placed into an evidence locker.
Robert Bass of the DFS testified that the sealed, brown paper bag containing the blue jeans was submitted to the lab by -Investigator Taylor on July 11, 2005. The jeans remained in the evidence locker until they were removed for analysis. Bass testified that the jeans were removed from the locker, unsealed, and examined for blood stains on August 12, 2005. The blood stains were readily apparent, and a DNA analysis was conducted. After-wards, the jeans were resealed and secured in the evidence locker until they were returned to Investigator Taylor on October 11, 2005.
When Investigator Taylor retrieved the blue jeans and other items from the DFS, she transported them to the evidence vault, where the evidence remained until trial. Investigator Taylor admitted that the bag containing the blue jeans did not bear a bar code, but she stated that she was able to establish that the jeans were part of the Riley investigation due to her telephone conversation with Investigator Freeman and Officer Redcross’s identification of the evidence. When asked whether the missing bar code was significant, Investigator Taylor testified that it was not significant because the bar-code system in place at that time was problematic and often resulted in printing failures and jams.
When the State moved to admit the blue jeans into evidence as State’s exhibit 44, defense counsel objected, stating:
“We would like to note our objection to the chain of custody from what we heard yesterday. At some point in time there was a point which this — these items could not be identified as the custodian of them was not aware where they were stored where he thought they were at the time. The — when it was a response they did no inventory list on this item. The person that took it into custody, Susanna Taylor, was responsible for the evidence in the vault. She too could not identify these items at which point Red-cross then investigator in this who was not the only person in the chain of custody attempted to identify them by simply looking at them. We note our objection to the predicate and chain of custody.”
(R. 850-51.) The circuit court subsequently overruled the objection and admitted the blue jeans into evidence, stating: “Based on the evidence I heard about the sealed conditions and the chain as laid, objection is overruled.” (R. 851.) Bass later testified that the blood found on the blue jeans Riley was wearing at the time of his arrest matched Kirtley’s blood. (R. 860-61.)
In this case, the State clearly established that Officer Redcross collected and bagged the jeans before delivering them to Investigator Freeman, who placed them in a sealed bag inside the evidence vault. Once Investigator Freeman retired from *745 the police department, Investigator Taylor became the custodian of the evidence vault and was able to identify the jeans as part of the Riley investigation. Based on the above, the State reasonably established that “the item [wa]s the same as it was at the beginning of the chain,” Harrell v. State, 608 So.2d 484, 437 (Ala.Crim.App.1992) (citing Ex parte Williams, 548 So.2d 518 (Ala.1989)), and that no one had tampered with the jeans. Ex parte Jones, 592 So.2d 210, 212 (Ala.1991). This Court has repeatedly held that “ ‘ “[ejvidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item.” ’ ” Boyle v. State, 154 So.3d 171, 213 (Ala.Crim.App.2013) (quoting Martin v. State, 931 So.2d 736, 748 (Ala.Crim.App.2003), quoting in turn Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim.App.1994)). Therefore, the missing bar code at most created a weak link and, thus, was an issue of “ ‘credibility and weighty not one of admissibility.’” Wilson v. State, 142 So.3d at 770 (opinion on return to remand) (quoting Ex parte Holton, 590 So.2d 918, 920 (Ala.1991)). Accordingly, the circuit court properly admitted the blue jeans into evidence, and Riley is not entitled to any relief.
XI.
Riley next argues that the circuit court made several errors in instructing the jury during the penalty phase of his trial. Specifically, Riley contends that: 1) the circuit court’s erroneous instructions allowed the jury to believe that it could not consider a mitigating circumstance unless the entire jury agreed upon its existence, 2) the circuit court erred in refusing defense counsel’s request to argue residual doubt as a mitigating circumstance in favor of a sentence of life without parole, and 3) the circuit court erroneously instructed the jury that it could not consider mercy in sentencing Riley.
A.
First, Riley argues that the circuit court erred by leading the jury to believe it could not consider a mitigating circumstance unless the entire jury agreed upon its existence. Specifically, Riley contends that by repeatedly using the terms “you” and “your” during its penalty-phase instructions, the circuit court implied that the jury had to unanimously agree on the existence of a mitigating circumstance before it could be considered. This jury instruction, however, was not objected, to at trial; thus, our review is limited to plain error. Rule 45A, Ala. R.App. P.
This Court has previously considered and rejected this exact claim in Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), stating: “Use of the word ‘you,’ without more, in relationship to a jury charge on mitigating evidence does not imply that the finding of a mitigating circumstance must be unanimous.” 820 So.2d at 148 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990)). Further,
“[a]s we stated in Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000):
“ ‘The appellate courts of this state have consistently held, since the United States Supreme. Court’s decision in Mills [v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)], that as long as there is no “reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances,” there is no error in the trial court’s instruction on mitigating circumstances. Freeman [v. State], 776 So.2d [160] at 195 [(Ala.Crim.App. 1999) ]. See also Ex parte Martin, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. *746 State, 710 So.2d 1276 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).’
“784 So.2d at 351.
Calhoun v. State, 932 So.2d 923, 972 (Ala.Crim.App.2005).
This Court has reviewed the circuit court’s instructions on mitigating circumstances and holds that there is no “reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances.” Calhoun, 932 So.2d at 972 (internal citations and quotations omitted). Accordingly, there was no error in the circuit court’s instructions, and Riley is not entitled to any relief.
B.
Next, Riley argues that the circuit court erred in refusing to allow defense counsel to submit evidence regarding residual doubt or to argue residual doubt as a mitigating circumstance. Before trial, Riley filed a “Motion to Submit Evidence and Argue Residual Doubt at the Penalty Phase” (C. 36-39), specifically requesting “permission to submit evidence at the penalty phase that would cast doubt on his guilt and conviction, the circumstances surrounding his participation in the offense, and lessen his level of culpability for the offense.” (C. 36.) Additionally, Riley asked the circuit court to “provide instruction to the jury at the penalty phase of the trial ... directing] them to consider evidence introduced at the guilt and penalty phases as well as any residual doubts as factors mitigating against the imposition of the death penalty.” (C. 39.)
During the pretrial-motion hearing, the circuit court ruled that Riley would
“certainly be allowed to present any and all mitigating evidence but residual doubt is not a mitigating circumstance. So to the extent you wish to argue residual doubt as a mitigating circumstance, there is caselaw directly on point.... Residual doubt is not a mitigating circumstance. So your motion is argued that you want to submit any mitigating circumstances to the jury. Certainly that will be granted but if you want to argue residual doubt that will not be allowed.”
(R. 77-78.) To the extent that he now challenges this particular ruling, his argument is without merit. In Ex parte Lewis, 24 So.3d 540 (Ala.2009), the Alabama Supreme Court rejected the petitioner’s argument that he had a constitutional right to present residual doubt as a mitigating factor, explaining:
“Section 13A-5-51, Ala.Code 1975, without limiting possible mitigating circumstances, statutorily defines a number of mitigating circumstances. Residual doubt as to the defendant’s guilt is not a statutory mitigating circumstance. Instead, as the State argues, ‘all seven statutory mitigating circumstances [in § 13A-5-51, AIa.Code 1975,] relate to the defendant or the circumstances of the crime for which the defendant [has been found guilty] and merely reduce the defendant’s culpability for committing that crime.’ State’s brief, at 29.
“Section 13A-5-52, Ala.Code 1975, allows a capital defendant to offer mitigating circumstances in addition to those enumerated in § 13A-5-51. Specifically, it provides:
*747 “ ‘In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstances which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.’
“It is inarguable, as the Court of Criminal Appeals has pointed out on many occasions, that residual doubt is not a factor about the ‘defendant’s character or record [or] any of the circumstances of the offense.’ See, e.g., Melson v. State, 775 So.2d 857, 899 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000). Indeed, as the State argues, residual doubt ‘is nothing more than a juror’s state of mind and bears directly on the defendant’s guilt, [and] is not a fact or situation relating to the defendant’s character or record or which reduces the defendant’s culpability in the commission of a crime for which guilt is a foregone conclusion.’ State’s brief, at 25.
“According to Lewis, the language of § 13A-5-52 providing that ‘mitigating circumstances shall include ... any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death’ is broad enough to allow the consideration of residual doubt at the penalty phase of a capital-murder trial. It is not, however, because residual doubt is not a ‘relevant mitigating circumstance.’
“A mitigating circumstance is ‘[a] fact or situation that does not bear on the question of a defendant’s guilt but is considered ... in imposing punishment and esp. in lessening the severity of a sentence.’ Black’s Law Dictionary 260 (8th ed.2004). As previously stated in this opinion, residual doubt bears directly on the question of a defendant’s guilt. In fact, Lewis admits as much: ‘Residual doubt arises because even though the evidence the juror saw was enough to convict, there is a possibility that ... the defendant is really innocent.’ Lewis’s reply brief, at 13. Also, residual doubt is not a ‘fact or situation.’ Instead, it is merely ‘a lingering uncertainty about facts, a state of mind that exists somewhere between “beyond a reasonable doubt” and “absolute certainty.” ’ Franklin v. Lynaugh, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O’Connor, J., concurring). Stated simply, Lewis’s arguments find no support in Alabama’s statutory provisions addressing mitigating circumstances.
“Residual doubt is not a mitigating circumstance. Consequently, the Court of Criminal Appeals was correct in holding that the trial court did not err in denying Lewis’s requested jury charge on residual doubt during the penalty phase of Lewis’s capital-murder trial.”
24 So.3d at 543-44.
Because Riley’s argument is contrary to established precedent, the circuit court did not err in denying his requested penalty-phase instruction on residual doubt. Accordingly, Riley is not entitled to any relief.
C.
Next, Riley argues that the circuit court erroneously informed the jury that it could not consider mercy when making its sentencing determination. Specifically, Riley challenges the circuit court’s penalty-phase instructions that the jury “must avoid any influence of prejudice or passion or any other arbitrary factor.” (R. 1325.) However, this Court has previously consid *748 ered and rejected this particular argument.
In Wilson v. State, 142 So.3d at 797 (opinion on return to remand), this Court held:
“Wilson argues that the circuit court erroneously allowed the jury to believe it could not consider mercy when it stated that the jury ‘should avoid any influence of passion, prejudice or any other arbitrary factor.’ (R. 808.)
“This argument has been addressed and rejected by this Court, and the circuit court’s instructions on passion and prejudice have been upheld as proper. See Vanpelt v. State, 74 So.3d 32, 93 (Ala.Crim.App.2009); Barber v. State, 952 So.2d 393, 450-53 (Ala.Crim.App.2005); Whisenhant v. State, 482 So.2d 1225, 1235-36 (Ala.Crim.App.1982); see also Jefferson v. State, 473 So.2d 1100, 1103 (Ala.Crim.App.1984) (failure to instruct jury to avoid any influence of passion, prejudice or other arbitrary factor required remand for new sentencing hearing). Wilson has not offered the Court any compelling reason to revisit these cases. Therefore, he has not shown that the circuit court’s instruction was erroneous and is not entitled to relief on this claim.”
As in Wilson, Riley has not offered this Court any reason to revisit this issue. Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009). Consequently, there was no error in the circuit court’s jury instruction regarding its duty to avoid any influence of prejudice or passion or any other arbitrary factor, and Riley is not entitled to any relief.
XII.
Riley next argues that the circuit court erroneously failed to instruct the jury on the lesser-included offense of first-degree robbery. Specifically, he contends that because the jury was not afforded the option of convicting him on a lesser-included offense, the imposition of the death penalty in this case is both arbitrary and capricious. Riley did not raise this argument to the circuit court; therefore, this Court will review it for plain error only. See Rule 45A, Ala. R.App. P.
Relying on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), Riley argues that the failure to instruct the jury on the lesser-included offense of robbery rendered his death sentence unconstitutional because it denied the jury the option of convicting him of a noncapital offense. Rejecting a similar argument in Maples v. Allen, 586 F.3d 879, 893-94 (11th Cir.2009) (per curiam), rev’d on other grounds, Maples v. Thomas, — U.S. —, 132 S.Ct. 912, 181 L.Ed.2d 807 (2012), the United States Court of Appeals for the Eleventh Circuit held:
“Maples relies primarily on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), but Beck is completely inapposite because it involved an all-or-nothing statute no longer extant. In the 1970s, Beck was convicted of capital murder. In Beck, the Supreme Court invalidated an Alabama statute that absolutely prohibited in capital cases the charging of all non-capital lesser included offenses. Although the evidence warranted such an instruction in Beck’s case, the Alabama jury was given the choice only of (1) convicting Beck of the capital offense, for which the jury must impose the death penalty, or (2) setting him free. Beck, 447 U.S. at 628-30, 100 S.Ct. at 2385-86. The Supreme Court held Alabama’s all-or-nothing statute was unconstitutional because the absolute preclusion in a capital case of a lesser included offense, when the evidence supported it, violated procedural due process. See Beck, 447 U.S. at 627, 100 S.Ct. at 2384 (overturning death *749 penalty where jury “was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict’); cf. Hopper v. Evans, 456 U.S. 605, 610-14, 102 S.Ct. 2049, 2052-54, 72 L.Ed.2d 367 (1982) (upholding death sentence even though jury was instructed on only capital offense under Alabama’s preclusion statute, because the evidence did not support a lesser included offense charge and defendant was thus not prejudiced by preclusion statute)_ [A] lesser included non-capital offense instruction is warranted!, however,] only when the evidence supports such an instruction.”
(Emphasis added.) Similarly, this Court has held that “ ‘[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ Alabama Code 1975, § 13A-l-9(b) (emphasis added).” Bell v. State, 518 So.2d 840, 842 (Ala.Crim.App.1987); see also Ex parte Myers, 699 So.2d 1285, 1291 (Ala.1997) (“A. charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge.”) (citations and internal quotations omitted).
Based on the evidence presented at trial and Riley’s failure to offer any theories in support of a charge on a lesser-included offense, there was no rational basis to support such an instruction. See Welch v. State, 630 So.2d 145, 146 (Ala.Crim.App.1993) (“ ‘When the evidence clearly shows that the appellant is either guilty of the offense charged, or innocent, the charge' on a lesser-included offense is not necessary or proper.’ ” (quoting Hollins v. State, 415 So.2d 1249, 1253 (Ala.Crim.App.1982))). The undisputed evidence established that Riley committed robbery and, during course of that robbery, killed Kirtley, the store clerk. Thus, there was no rational basis from the evidence on which the jury could have convicted Riley of anything less than felony murder. Therefore, the circuit court properly refused to instruct the jury on the lesser-included offense of robbery.
XIII.
Riley next contends that the circuit court erred in admitting an out-of-' court identification of Riley by a nontesti-fying third party. Specifically, Riley contends that the circuit court erred by allowing Officer Redcross to testify that David Ashley identified Riley as the perpetrator of this crime after viewing the surveillance video, which was broadcast on television. Because the State did not call Ashley as a witness, Riley argues that he was not afforded an opportunity to challenge the identification in violation of his Sixth Amendment right to confront the witnesses against him. Riley did not present this particular argument to the circuit court; therefore, this Court will review it for plain error only. See Rule 45A, Ala. R.App. P.
In an attempt to identify the perpetrator, the Florence Police Department released a portion of the surveillance video footage to the local media. After seeing the surveillance video, Ashley, an acquaintance of Riley, contacted authorities and claimed that he was “eighty percent sure” that Riley was the person on the video. (R. 710; 616-17.)
Assuming, without deciding, that the circuit court erred in admitting the testimony concerning Ashley’s out-of-court identification of Riley, that error did not affect the outcome of the proceeding and, thus, was harmless. Rule 45, Ala. R.App. P. It is well settled that “ ‘[t]estimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be in *750 ferred.’” Gobble v. State, 104 So.3d 920, 959 (Ala.Crim.App.2010) (quoting Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993)). ‘The erroneous admission of evidence that is merely cumulative is harmless error.’ ” Gobble, 104 So.3d at 959 (quoting Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995)).
In this case, the jury was shown the exact same surveillance video that aired on local news stations shortly after the robbery-murder occurred and could have easily identified Riley from the surveillance video themselves. Additionally, Officer Hearn testified that he viewed the surveillance video as part of the investigation and identified Riley as the perpetrator. Therefore, any error in the admission of Officer Redcross’s testimony was harmless and does not rise to the level of plain error. Rule 45A, Ala. RApp. P.
XIV.
Riley next argues that the circuit court erred in granting in part and denying in part his motion for funds to hire a mitigation expert to assist in the penalty phase of his trial proceedings.
“In Ex parte Moody, 684 So.2d 114 (Ala.1996), the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant’s request for expert assistance:
“ ‘Although the [United States] Supreme Court has not specifically stated what “threshold showing” must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant “offered little more than undeveloped assertions that the requested assistance would be beneficial.” Caldwell v. Mississippi, 472 U.S. 320 at 323, 105 S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in Dubose [v. State, 662 So.2d 1189 (Ala.1995),] the Supreme Court cases of Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985),] and Caldwell, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. “Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial.” Dubose, 662 So.2d at 1192, citing Moore v. Kemp, 809 F.2d 702 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).
[[Image here]]
“ ‘Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.’
“Moody, 684 So.2d at 119.”
Billups v. State, 72 So.3d 122, 129-30 (Ala.Crim.App.2010).
Before trial, Riley filed an ex parte motion for funds to hire a mitigation expert, in which he argued:
“Because the State is seeking the death penalty, counsel needs an expert to assist in mitigation investigation and *751 aid in the preparation and presentation of evidence in the penalty phase. A mitigation specialist is necessary to explore the mitigating circumstances in this case. Defense counsel requires assistance in obtaining and presenting information and records relevant to Mr. Riley’s medical and mental health history, educational history, employment and training history, family and social history, his correctional history, and any religious or cultural influences. Additionally counsel needs expert mitigation assistance to identify, help seek out, interview, and assess potential witnesses familiar with aspects of Mr. Riley’s life history, including members of his immediate and extended family, neighbors, friends, former teachers, clergy, employers, co-workers, social service providers, doctors, correctional officers, probation or parole officers, and members of the victim’s family.
“Without a mitigation specialist, counsel will be forced to violate her constitutional, legal and ethical duty to investigate fully all aspects of Mr. Riley’s life and the charge against him....
“In addition, counsel needs a mitigation expert because of the advocate-witness rule. Because counsel cannot testify in her client’s case, counsel must conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial in the event that a witness gives testimony that is inconsistent with what he told counsel during the investigation.
“Moreover, using a mitigation expert is the most cost-effective way to conduct the investigation. The expert can locate and interview witnesses and obtain records and documents at a lower hourly rate than would be paid to an attorney. Upon the completion of the initial stages of the investigation, counsel’s time can then be utilized interviewing those witnesses whose potential testimony would be desired at trial and making a professional determination as to their usefulness.”
(C. 202-03.) Further, during the pretrial-motions hearing, defense counsel argued two additional factors in support of his motion: 1) that Riley spent three years in a penal institution and he was unqualified to determine what effect, if any, incarceration had had on Riley; and 2) that Riley’s biological mother had reestablished her relationship with Riley after years of estrangement. The circuit court then inquired about the mitigation expert from Riley’s first trial. Defense counsel explained to the court that Dr. Cliff Olson, the mitigation expert from the previous trial, was “out of that business, due to some personal, emotional family problems” (R. 108), but counsel argued that a mitigation expert would be necessary to investigate Riley’s period of incarceration between the two trials and the effect of his biological mother’s abandonment of him at a young age. At the conclusion of the hearing, the circuit court stated that it was granting Riley’s motion “to a limited extent” in order to supplement what had previously been done and to include any new information since his last trial. (R. 109.) However, the circuit court went on to state that it would not appoint a new mitigation expert to “redo things that have already been done” during the first trial. (R. 109.)
Based on the above, Riley has failed to “show a reasonable probability that [the requested] expert would [have] aid[ed] in his defense ... [or that the] denial of [the] expert to assist at trial ... resulted] in a fundamentally unfair trial.” Dubose v. State, 662 So.2d 1189, 1192 (Ala.1995) (citing Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.1987)). Instead, defense counsel merely speculated that a mitigation expert would be of assistance “if [they] decide[d] to pursue th[e] [issue] with his mother.” *752 (R. 108.) Further, the circuit court granted Riley’s motion to the extent necessary to supplement the existing report with any new information since Riley’s first trial. Therefore, the circuit court did not err in granting in part and denying in part Riley’s motion for funds to hire a mitigation expert, and Riley is not entitled to any relief.[6]
XV.
Riley next argues that the circuit court erred by allowing into evidence excerpts from recordings of telephone calls he made while incarcerated in the Lauder-dale County Detention Facility. Specifically, he. contends that the recordings were inadmissible because the “witness [failed to] testify that: 1) the operator of the device was competent; 2) the resulting recording was authentic and correct; 3) no changes had been made to the tape; and 4) the manner in which the conversation was preserved.” (Riley’s brief, at 69.) Because Riley did not object to the admission of the recordings at trial, this Court will review this argument for plain error only. See Rule 45A, Ala. R.App. P.
“In Ex parte Fuller, 620 So.2d 675 (Ala.1993), the Alabama Supreme Court explained the two methods for laying the foundation for the admissibility of an audiotape or videotape:
“ ‘The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the “silent witness” foundation must be laid. Under the “silent witness” theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the “silent witness” theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980),] test. Rewritten to have more general application, the Voudrie standard requires:
“ ‘(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
“ ‘(2) a showing that the operator of the device or process or mechanism was competent,
“ ‘(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“‘(4) a showing that no changes, additions, or deletions have been made,
*753 ‘“(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
“ ‘(6) identification of the speakers, or persons pictured, and
‘“(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
“ ‘On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the “pictorial communication” theory. Under this theory, the party offering the item must present sufficient evidence to meet the “reliable representation” standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.’
“620 So.2d at 678.”
McCray v. State, 88 So.3d 1, 61-62 (Ala.Crim.App.2010) (emphasis omitted). Further,
“ ‘[i]n determining whether there is a sufficient showing of accuracy to warrant the admissibility of tape recordings, the governing standard is whether the possibility of misiden-tifieation and adulteration is eliminated, not absolutely, but as a matter of reasonable probability, and the trial judge has broad discretion in determining whether the foundation requirements for admissibility are satisfied. Furthermore, if there is independent evidence of the accuracy of the recordings to be admitted at trial, the trial court may admit them even if the offering party has at that time not carried its particularized burden of going forward.’
“23 C.J.S. Criminal Law § 1046(b) at 325 (1989) (footnotes omitted).”
Paige v. State, 621 So.2d 372, 373 (Ala. Crim.App.1993).
The predicate for admission of the recordings was sufficiently established by the testimony of Melissa Smith, the administrative assistant of the Lauderdale County Detention Facility during the time Riley was incarcerated. Smith testified that the inmates were issued a personal-identification number (“PIN”), which was usually their Social Security number, allowing them to make telephone calls. Smith further testified that all telephone calls were recorded and that the caller was told before making the telephone call that it would be monitored and recorded. During the investigation.of this case, Officer Red-cross contacted Smith and asked her to pull the records of any calls Riley had made or received while in jail. Smith pulled the telephone records from January 11, 2005, through January 27, 2005, using Riley’s PIN and saved the recordings onto discs. Smith testified that she had listened to the recordings and that, based on her experience, the telephone system was “capable of accurately recording phone calls” and “whatever is being said is recorded.” (R. 802.) Officer Redcross then testified that he had also reviewed the recordings and found that they were “fair and accurate recordings of the actual phone call.” (R. 804.) Officer Redcross further testified that he was able to identify Riley’s voice on the recordings, as well as the voices of Riley’s parents, brother, and cousin.
In this case, the testimony by Officer Redcross and Melissa Smith established that the recordings were both accurately recorded and reliable. Therefore, the *754 State properly authenticated the recordings pursuant to the “silent witness” theory. See Ex parte Rieber, 663 So.2d 999, 1008-10 (Ala.1995). Accordingly, Riley’s argument is without merit.
XVI.
Riley next argues that the circuit court erroneously allowed the State to introduce and repeatedly rely on the three highly prejudicial and inflammatory surveillance videos from the crime scene. Specifically, he contends that: a) the State was erroneously permitted to show the videos to the jury before their admission into evidence and b) the State’s excessive use of the videos, which showed various angles of the same incident, was highly prejudicial as compared to its probative value.
The three surveillance videos at issue clearly depict Riley robbing Dandy’s and leading Kirtley into a back room. Although there is no video of the actual murder, the audio portion of the videos recorded the sound of each gunshot, as well as the “clearly audible, drawn out, agonizing ‘scream’ of the victim....” (C. 257.)
Before trial, defense counsel filed a motion in limine requesting that the circuit court limit the State “to only (a) one showing, of (b) only one (1) video selected by the State.” (C. 257-58.) Specifically, defense counsel argued that the three videos depicted the same actions from three different camera angles, did nothing to further prove that Riley committed the acts in issue, and were both highly prejudicial and inflammatory. During the hearing on this motion, defense counsel once again argued that the prejudicial impact of the videos outweighed any probative value. Defense counsel further argued that the audio portion of the tapes was particularly disturbing and that he did not feel that “the average juror c[ould] listen to that, ... over and over and not be unfairly prejudiced by it....” (R. 120.) The circuit court disagreed and denied Riley’s motion.
A.
To the extent that Riley first objects to the videos being shown to the jury before their admission into evidence, his argument is without merit.
Before the State’s opening statement, defense counsel made the following objection:
“Judge, we object at this point to playing — offered by the State of anything that may particularly be evidence. This is a point under Rule 19.1[, Ala. R.Crim. P.]. This is what — the State has an opportunity in opening to tell what they expect the evidence to be and not put on evidence before it is admitted and predicate and foundation is laid for that evidence. We object to this under the rule that by playing this at this point would be prejudicial to my client.”
(R. 497.) The circuit court overruled Riley’s objection, and the videos were played for the jury. Relying on Ex parte Baker, 906 So.2d 277, 288 (Ala.2004), Riley argues on appeal that the circuit court erred in allowing the State to play the surveillance videos during its opening statements before they were admitted into evidence.
In Ex parte Baker, the Alabama Supreme Court stated that, “[w]hile the trial judge’s allowing [the prosecutor to show the jurors evidence before it was admitted during his opening statements] did not constitute plain error in this case, the tactic certainly should not be encouraged.” Id. at 288. Although the Court made clear that is does not encourage such actions, it did not hold, as Riley suggests, that it is unequivocally reversible error for jurors to be shown evidence before its admission. Further, when addressing this same issue *755 following Baker’s retrial, this Court stated as follows:
“When it previously reversed Baker’s conviction and sentence, the Alabama Supreme Court also stated, in dicta:
“‘For the erroneous admission of the inadmissible hearsay, the defendant’s capital murder conviction must be reversed and the case remanded for a new trial. Two caveats may prevent other errors upon the retrial.
[[Image here]]
“ ‘... [T]he opinion of the Court of Criminal Appeals in this case, [Ex parte Baker,] 906 So.2d 210 [(Ala.2004)], expressly approves the prosecutor’s showing photographs to the jurors during his opening statement, before the photographs had been admitted into evidence. While the trial judge’s allowing this tactic did not constitute plain error in this case, the tactic certainly should not be encouraged. Except by agreement of the parties, jurors should not see or hear evidence before its admission as such. See Acklin v. State, 790 So.2d 975, 1004 (Ala.Crim.App.2000).’
“Ex parte Baker, 906 So.2d at 288.
“In Part II of this opinion, we specifically found that the trial court did not err in admitting the recording of the 911 telephone call into evidence. We have also reviewed the photographs, and we do not find that the trial court committed error, much less plain error, in admitting them into evidence. Although, as the Alabama Supreme Court previously stated, ‘the tactic certainly should not be encouraged,’ we do not find that the prosecutor’s playing of the 911 recording and displaying of photographs during his opening statement constituted error, much less plain error, in this case.”
Baker v. State, 87 So.3d 587, 600 (Ala.Crim.App.2009).
As in Baker v. State, the record in this ease indicates that, during trial, the surveillance videos at issue were properly admitted into evidence without objection; therefore, this Court does not find that it was error for the prosecution to play the surveillance videos during its opening argument. Accordingly, Riley is not entitled to any relief.
B.
Riley next argues that the State’s excessive use of the surveillance videos, “and the showing of various angles of the same incident” (Riley’s brief, at 70), was highly prejudicial and far outweighed any probative value. Specifically, he contends that “[t]he admission of repeated showings of the same incidence — from various angles — violated [his] rights to due process, a fair trial[,] and reliable sentencing as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama law.” (Riley’s brief, at 71.) Riley did not properly object to the admission of this evidence at trial; therefore, this Court reviews this issue for plain error only.[7] Rule 45A, Ala. R.App. P.
*756 Riley’s argument regarding the prejudicial effect of the surveillance videos is undoubtedly correct; “however, ‘while such direct evidence of a crime is certainly prejudicial to a defendant’s case, without more, it is not unfairly so.’” Ivery v. State, 686 So.2d 495, 519 (Ala.Crim.App.1996) (quoting United States v. Weisz, 718 F.2d 413, 432 (D.C.Cir.1983)). Further, “the balancing of probative value against prejudicial effect is a matter which is within the discretion of the trial court.” United States v. Guerrero, 667 F.2d 862, 867 (10th Cir.1981) (citing United States v. Parker, 604 F.2d 1327, 1329 (10th Cir.1979)).
‘“In a criminal prosecution much of the evidence is prejudicial to the defendant but that does not rule it out if it is relevant and it is competent as well, as this evidence was when you can gainsay the value of a motion picture, the commission of the crime. Indeed, this is the answer to a prosecutor’s dream, to have such evidence as this.’ ”
Ivery, 686 So.2d at 519 (quoting Guerrero, 667 F.2d at 867).
In his pretrial motion in limine, Riley argued:
“[The] [r]epeated showing and viewing of the tape(s) from only different angles, especially when coupled with repeatedly hearing the agonizing, prolonged ‘death scream’ of the deceased is at best cumulative, does nothing to provide different, additional, or more proof of Defendant’s guilt, is highly prejudicial and sure to serve only one (1) purpose, i.e., to ‘inflame’ the jury, and its prejudicial impact outweighs any probative value (in support of Defendant’s guilt). See Fed. Rul.Evid. 404(b), and Rideau v. Louisiana, 373 U.S. 723, 731 (1963).”
(C. 257-58; R. 120.) As a result of the highly prejudicial and inflammatory nature of the videos, defense counsel requested that the circuit court “limit how many times that those tapes can be played to the jury.” (R. 120.) The circuit court, however, denied Riley’s motion, stating that it was “not going to at this point say the State can only play it once or twice or not more than three times[,] but if it comes to the point in the trial where it is beyond the bounds, [it] will put a stop to it.” (R. 120.)
After reviewing the particular videos at issue, this Court finds that “the video[s’] probative value outweighed any conceivable prejudice.” Ivery, 686 So.2d at 518. As such, Riley was not unduly prejudiced by the fact that the videos were played more than once; therefore, he is not entitled to any relief.
XVII.
Riley next argues that the circuit court erred in allowing the State to admit a Styrofoam model of a head containing three wooden dowels illustrating “the trajectory of the bullets entering [Kirtley’s] head.” (Riley’s brief, at 71; R. 973-74.) Specifically, Riley contends that the use and admission of this particular demonstrative aid was both unnecessary and unduly prejudicial. He does not, however, argue that the evidence was inaccurate or misleading to the jury. See Ivey v. State, 369 So.2d 1276, 1277 (Ala.Crim.App.1979) (“Since the conditions were reasonably or substantially similar and the use of the mannequin was not calculated to unfairly prejudice the appellant, we find that the trial court did not abuse its discretion in allowing the demonstration.”). Further, because Riley did not object to the admission of this evidence at trial, this issue is reviewed for plain error only. Rule 45A, Ala. R.App. P.
In Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010) this Court addressed this exact issue, stating:
“Whether to allow the prosecutor to use mannequins to aid the jury in under *757 standing the . trajectory of a ' bullet through a victim is within the sound discretion of the circuit court and a conviction ‘will not be reversed on appeal unless [that discretion] has been clearly and grossly abused.’ Ivey v. State, 369 So.2d 1276, 1278 (Ala.Crim.App.1979) (citations omitted). Further, this Court has held that the use of a mannequin to demonstrate ,a victim’s injuries is relevant and admissible. Id.; see Minor v. State, 780 So.2d 707, 765 (Ala.Crim.App.1999), overruled on other grounds, 780 So.2d 796 (Ala.2000); see also Gobble v. State, [104] So.3d [920, 961-62 (Ala.Crim.App.2010)] (‘Demonstrations and experiments are permitted or prohibited in the trial court’s discretion. Thus, Alabama appellate courts have affirmed trial court decisions permitting an experiment on cross-examination to test the defendant’s ability to calculate interest as he said he had; a demonstration using a mannequin and the defendant herself to discredit her assertion that the prosecuted homicide happened accidentally; a demonstration of the defendant’s version of how a fight occurred, the solicitor playing the deceased and the defendant playing himself; a demonstration wherein the defendant made prints of his bare feet in the sawdust on the courtroom floor; a demonstration by the defendant of the extent to which his injuries had impaired his ability to walk; and a demonstration between a brain damaged child and a special education therapist calculated to show the child’s physical and mental abilities.’ (quoting William A. Sehroeder and Jerome A. Hoffman, Alabama Evidence § 12:25 (3d ed.2006) (footnotes omitted))).
“Here, the use of the mannequin heads was relevant and admissible to illustrate the coroner’s testimony regarding the trajectory of the bullets through the victims and to aid the jury in understanding the extent of the victims’ injuries. Further, nothing in the record indicates that ‘the use of the mannequin was ... calculated to unfairly prejudice [Mitchell].’ Ivey, 369 So.2d at 1279. Consequently, this Court cannot say that the circuit court ‘clearly and grossly abused’ its discretion by allowing the prosecutor to use mannequin heads to show the trajectory of the bullets through the victims. Ivey, 369 So.2d at 1278.”
84 So.3d at 1006-07.
Similarly, in this case Dr. Craig testified that the position of the wooden dowels in the Styrofoam head fairly and accurately represented the trajectory of the bullets based on his autopsy findings. Therefore, the circuit court did not abuse its discretion in allowing the State to use a Styrofoam head in order to show the trajectory of the bullets as they entered the victim’s head. Accordingly, Riley is not entitled to any relief.
XVIII.
Riley next argues that, during jury selection, the circuit'court improperly limited voir dire, improperly allowed certain veniremembers to be struck for cause, and improperly death-qualified the jury. These arguments are without merit.
A.
Riley first argues that the circuit court improperly limited his voir dire questions concerning the veniremembers’ religious views and exposure to pretrial publicity.
This Court has previously held:
“The scope of the voir dire examination of veniremembers is left largely to the discretion of the trial court and will not be disturbed on appeal on the ground that voir dire examination was limited absent an abuse of that discretion. Nodd v. State, 549 So.2d 139 (Ala. *758 Cr.App.1989). The right to question veniremembers regarding their qualifications to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case. McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990).
“ ‘The trial judge has considerable discretion in deciding what questions may be asked of the prospective jurors on voir dire. He must be free to exclude those questions which are “intended solely to accomplish such improper purpose” or which are not “phrased in neutral, non-argumentative form.” He must also be able to “restrict the examination of jurors within reasonable bounds so as to expedite the trial.” And he must on occasion be allowed to restrict questioning in order to give some protection to the privacy of prospective jurors.
“ ‘It has been correctly noted that “appellate courts will only rarely reverse a trial judge’s decision” not to permit certain questions on voir dire. Generally, courts are inclined not to reverse unless it seems likely that as a result of the limited voir dire the jury was prejudiced.’
“3 W. LaFave and J. Israel, Criminal Procedure § 21.3 (1984) (citations omitted).”
Smith v. State, 698 So.2d 189, 198-99 (Ala.Crim.App.1996). Further,
‘“[i]n Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.’ Coral v. State, 628 So.2d 954, 968 (Ala. Cr.App.1992). ‘The fact that the appellant’s case involved capital murder is not alone reason to require individual voir dire.... A trial court’s decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion.’ Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).”
Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App.1994).
In this case, the circuit court properly limited the scope of defense counsel’s regular, and individual voir dire questions regarding the veniremembers’ preconceived notions of Riley’s guilt, as well as their exposure to pretrial publicity. While questioning the veniremembers regarding their qualifications to serve on the jury, the circuit court asked whether “any of you [are] so opposed to the death penalty that you cannot be a fair and impartial juror?” (R. 228.) The veniremembers who answered in the affirmative were then questioned individually and asked whether their answers were based on psychological or religious reasons. All six venire-members who indicated that they could not be fair and impartial or who were unsure if they could be fair and impartial were dismissed for cause.
Later, during voir dire, defense counsel described what the State expected the evidence to show and asked whether any veniremembers had already formed an opinion about Riley’s guilt or innocence. The prosecution objected, and defense counsel asked permission to approach. Defense counsel then informed the court that he had done some research and was “allowed to ask [the veniremembers] about their religious views or prospective *759 of death penalty but [stated that he] w[ould] 'not go into that if [the court] objected] to it.” (R. 346.) The circuit court ruled that although defense counsel could “ask a juror question if there’s anyone here for religious purposes or they’re opposed to the death penalty[,] ... going one by one ... would not be allowed.” (R. 346.) Despite this ruling, however, the record reveals that all veniremembers who previously indicated that they had prior knowledge of the case were later individually questioned about the extent of their knowledge and the existence of any preconceived notions. The record further reveals that defense counsel was also given an opportunity to individually voir dire these particular veniremembers concerning any preconceived notions about the case. Thus, the circuit court did not abuse its discretion in properly limiting defense counsel’s questions regarding the veniremembers’ preconceived notions about Riley’s guilt or innocence. See Smith, 698 So.2d at 198 (“The right to question veniremembers regrading their qualification to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case.” (citing McLeod v. State, 581 So.2d 1144 (Ala.Crim.App.1990))).
Similarly, the circuit court properly restricted counsel’s questions relating to the veniremembers’ exposure to pretrial publicity and, instead, individually questioned veniremembers who indicated that they had heard about the case to determine the extent of their exposure and independent knowledge of the case. Specifically, the circuit court asked these particular veniremembers whether they had heard about the ease and from what sources, whether they recalled the specific details of the case, whether they recalled hearing about a videotape, and whether they would be able to disregard what they had heard and base their decision solely on the evidence presented. The circuit court then allowed the prosecution and defense to ask questions of these venire-members as well. During the questioning of the first veniremember, defense counsel asked whether he had “heard it referred to as execution styles murder?” (R. 359.) When the veniremember responded that he had not, defense counsel then asked whether he recalled the specific number of shots fired. The veniremember indicated that, based on what he had heard in the courtroom earlier, he believed that it was three shots. Defense counsel then asked whether “that ma[de] [his] blood run cold?” (R. 359.) The prosecution objected, and the circuit court properly sustained the State’s objection on the ground that counsel’s questions were argumentative and inflammatory. (R. 359-60.) See Smith, 698 So.2d at 198-99 (“‘The trial judge has considerable discretion in deciding what questions may be asked of the prospective jurors on voir dire. He must be free to exclude those questions which are “intended solely to accomplish such improper purpose” or which are not “phrased in neutral, non-argumentative form.” ’ ” (quoting 3 W. LaFave and J. Israel, Criminal Procedure § 21.3 (1984))). Following the circuit court’s subsequent and thorough voir dire concerning the effect of the pretrial publicity, all but six of thé veniremembers answered that any articles they had read about the case or anything they had heard about the case would not affect their verdict. The record reflects that the six veniremembers who responded that they were unsure whether they could be impartial were later dismissed for cause. Therefore, this Court does not find that the circuit court improperly limited defense counsel’s right to question the veniremembers regarding their exposure to pretrial publicity.
*760 B.
Riley next argues that the circuit court improperly dismissed venire-members R.H. and R.G. for cause' based on their fixed opinions as to the death penalty. Riley’s argument, however, is without merit.
The record indicates that, during voir dire, the circuit court asked if any venire-member had a fixed opinion in opposition to the death penalty. The veniremembers who indicated that they held fixed opinions regarding the imposition of the death penalty were subsequently questioned individually. When questioned regarding his opinion on the death penalty, R.H. replied that “[he] would have to give[ ] them life without parole” regardless of the evidence or amount of proof. (R. 237.) Similarly R.G. stated that her opposition to the death penalty was “based on the fairness of it.” (R. 230.) "When questioned further, R.G. stated that she hoped, but did not know,'whether she could base her decision on the law and “not have [her] personal feelings ... interfere with [her] ability to decide whether or not the State met its burden or proof.” (R. 230.) These venire-members were subsequently removed for cause, over defense counsel’s objection, based on their opposition to the death penalty.
“According to § 12-16-152, Ala.Code 1975:
“ ‘On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence.’
“See Rule 18.4(e), Ala. R.Crim. P. (‘When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.’).
“ ‘Also, “ ‘[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.’ ” McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
“ ‘ “[t]he test for determining whether a strike rises to the level of a challenge for cause is ‘whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence. Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). ‘The decision of the trial court “on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’” Nettles, 435 So.2d at 153. In Marshall v. State, 598 So.2d 14 (Ala.Cr.App.1991), this court held that it was not error for a trial court to deny challenges for cause of two jurors who stated that they knew the victim or her family. One venireinember had been employed as a maid by the victim’s family and the other stated that she knew the victim’s family. Marshall, 598 So.2d at 16. This court held that this relationship was not grounds for a challenge for cause as *761 long as the juror indicates that he or she can be fair and impartial. 598 So.2d at 16.”
“‘Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).’
“Killingsworth v. State, [82] So.3d [716], [732-38] (Ala.Crim.App.2009).”
Moms v. State, 60 So.3d 326, 379 (Ala.Crim.App.2010).
In this casé, the record of voir dire clearly establishes that these potential jurors indicated that they could not be impartial and follow the law because of their opposition to the death penalty; therefore, the circuit court did not abuse its discretion in removing these jurors for cause. Ex parte Smith, 698 So.2d 219, 221 (Ala.1997). Further, for the reasons stated below in subsection D, Riley is not entitled to any relief. See Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995) (“Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases”).
C.
Riley next argues that the circuit court erred in excusing veniremembers A.H., a single mother who had to pick up her six-year-old child by 2:40 p.m., three days a week, and D.J., who had purchased plane tickets for a vacation beginning the first week of trial, for hardship over defense counsel’s objection.
“Section 12-16-74, Code of Alabama 1975, expressly provides that a trial court in capital cases may excuse prospective jurors outside the presence of parties and their counsel, for reasons of ‘undue hardship, extreme inconvenience, or public necessity,’ as provided in § 12-16-63(b)[, Ala. Code 1975].” Ex parte Pierce, 612 So.2d 516, 518 (Ala.1992). Because the trial judge in a capital case may properly excuse veniremembers for the reasons set forth in § 12-16-63(b), we find no evidence that the circuit court abused its discretion by excusing A.H. and D.J. See Gwin v. State, 425 So.2d 500, 504 (Ala.Crim.App.1982) (“In excusing jurors much is left to the discretion of the trial judge.”).
D.
Riley next argues that death-qualifying the jury violated his constitutional right to an impartial jury. Specifically, he contends that “[e]xtensive social scientific evidence shows that (1) death-qualified juries are significantly more prone to convict than ordinary juries; (2) the process of pretrial death qualification, in which the defendant’s guilt is assumed, conditions the jury towards guilt; and (3) death qualification disproportionately excludes minorities and women.” (Riley’s brief, at 74-75.) Riley, however, did not object to the circuit court’s decision to death-qualify the jury; therefore, this issue will be reviewed for plain error only. See Rule 45A, Ala. R.App. P.
The Supreme Court of the United States has upheld the constitutionality of death-qualifying a jury. See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), this Court held:
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id,.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 *762 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis, 718 So.2d at 1157 (footnote omitted). See also McCray, 88 So.3d at 76-77; Vanpelt, 74 So.3d at 50. The practice of death-qualifying juries has been repeatedly held constitutional. Therefore, this Court finds no error, much less plain error, in the circuit court’s decision to death-qualify the jury. Accordingly, this issue does not entitle Riley to any relief.
XIX.
Riley next argues that his death sentence violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he contends that although the Alabama Supreme Court explicitly held in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), that Alabama’s death-penalty statute does not violate Ring, Waldrop was wrongly decided and that his death sentence cannot be affirmed pursuant to Ring since the “jury never made the factfindings necessary to support the imposition of the death penalty.” (Riley’s brief, at 76.)
Initially, this Court notes that Riley’s arguments with respect to Ring have been addressed and decided adversely to him by this Court and the Alabama Supreme Court. Further, this Court lacks the authority to overrule decisions of the Alabama Supreme Court. See Harris v. State, 2 So.3d 880, 902 (Ala.Crim.App. 2007); § 12-3-16, Ala.Code 1975.
In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that, under the Sixth Amendment, capital defendants are “entitled to a jury determination of any fact [other than a prior conviction] on which the legislature conditions an increase in their maximum punishment.” Ring, 536 U.S. at 600, 122 S.Ct. 2428. In Ex parte Waldrop, the Alabama Supreme Court applied Ring to a similar situation and held:
“[W]hen a defendant is found guilty of a capital offense, ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.’ Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (‘The fact that a particular capital offense as defined in Section 13A-5-40(a)[, Ala.Code 1975,] necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49[, Ala.Code 1975,] shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.’). This is known as ‘double-counting’ or ‘overlap,’ and Alabama courts ‘have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.’ Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5^49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Wal-drop’s case, the jury, and not the trial *763 judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring [v. Arizona], 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443 [(2002)]. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000),] require.”
859 So.2d at 1188.
Like the appellant in Waldrop, Riley was convicted of a capital offense that has a corresponding aggravating circumstance, i.e., murder committed during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. Accordingly, the jury’s verdict finding Riley guilty of murder during the course of a robbery established that the jury unanimously found that an aggravating circumstance existed.[8] Because the jury’s guilt-phase verdict established that the jury found a fact necessary to expose Riley to a sentence of death, Riley’s Sixth Amendment right to a jury was not violated.
Moreover, to the extent that Riley also argues that the circuit court erred in denying his motion to record the jury’s findings regarding mitigation, his argument is without merit. During the pretrial-motions hearing, defense counsel asked the circuit court to require special verdict forms for each of the jury’s findings regarding mitigating circumstances. The State responded that it did not believe that there was any legal authority to support defense counsel’s request. The circuit court agreed, adding that it was not aware of any precedent for such verdict forms and that defense counsel’s request was denied unless he could provide the court with specific citations to authority in support of his argument. It does not appear from the record that defense counsel ever offered any such authority. On appeal, Riley asserts without providing any authority that the circuit court erroneously denied his motion to record the jury’s findings regarding mitigation. This Court has not found any authority to support Riley’s position; therefore, this issue is without merit.[9] Accordingly, Riley is not entitled to any relief.
XX.
Riley next argues that the circuit court’s double-counting of robbery as aggravation in the guilt phase and as an aggravator in the penalty phase of his trial violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Specifically, he contends that although the Alabama Supreme Court has upheld the practice of “double-counting,” the use of robbery as an element of the capital offense in the guilt phase and as an aggravator in the penalty phase “failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty ... and subjected ... Riley to two punishments as a result of being convicted of a single criminal charge.” (Riley’s brief, at 78.) Riley raises this issue for the first time on appeal; therefore, it is reviewed for plain error only. Rule 45A, Ala. R.App. P.
*764 The Supreme Court of the United States, the Alabama Supreme Court, and this Court have all upheld the practice of “double counting” and expressly rejected Riley’s specific argument that “double counting” fails to narrow the class of eases eligible for the death penalty. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (“[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.”); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2680, 129 L.Ed.2d 750 (1994) (“The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).”); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Ex parte Woodard, 631 So.2d 1065, 1069-70 (Ala.Crim.App.1993) (rejecting the petitioner’s claim that Alabama’s capital-murder statute “is unconstitutional because it is arbitrary and because the subsection failed to sufficiently narrow the class of people that may become ‘death eligible’ ”); Thompson v. State, 153 So.3d 84, 180 (Ala.Crim.App.2012) (rejecting the appellant’s argument that double counting robbery as both an element of the capital offense and an aggravating circumstance “fail[ed] to narrow the class of those eligible for the death penalty”). Because Riley’s arguments are contrary to established precedent, and because he has offered this Court no principled reason to question the validity of that precedent, this issue does not entitle him to any relief.
XXI.
Riley next argues that the circuit court’s and the prosecution’s repeated references to the jury’s verdict as a “recommendation” improperly diminished the jury’s sense of responsibility for its sentencing determination in violation of Dar-den v. Wainwright, 477 U.S. 168, 183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). (Riley’s brief, at 79.) However, this issue has been addressed previously and decided adversely to Riley.
In Albarran v. State, 96 So.3d 131 (Ala.Crim.App.2011), this Court wrote:
“First, the circuit court did not misinform the jury that its penalty phase verdict is a recommendation. Under § 13A-5-46, Ala.Code 1975, the jury’s role in the penalty phase of a capital case is to render an advisory verdict recommending a sentence to the circuit judge. It is the circuit judge who ultimately decides the capital defendant’s sentence, and, ‘[w]hile the jury’s recommendation concerning sentencing shall be given consideration, it is not binding upon the courts.’ § 13A-5^7, Ala.Code 1975. Accordingly, the circuit court did not misinform the jury regarding its role in the penalty phase.
“Further, Alabama courts have repeatedly held that ‘the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was “advisory” and a “recommendation” and that the trial court would make the final decision as to sentence does not violate Caldwell v. Mississippi [, 472 U.S. 320 (1985) ].’ Kuenzel v. State, 577 So.2d 474, 502 (Ala.Crim.App.1990) (quoting Martin v. State, 548 So.2d 488, 494 (Ala.Crim.App.1988)). See also Ex parte Hays, 518 So.2d 768, 777 (Ala.1986); White v. State, 587 So.2d 1236 (Ala.Crim.App.1991); Williams v. State, 601 So.2d 1062, 1082 (Ala.Crim.App.1991); Deardorff v. State, 6 So.3d 1205, 1233 (Ala.Crim.App.2004); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris *765 v. State, 2 So.3d 880 (Ala.Crim.App.2007). Such comments, without more, do not minimize the jury’s role and responsibility in sentencing and do not violate the United States Supreme Court’s holding in Caldwell. Therefore, the circuit court did not err by informing the jury that its penalty-phase verdict was a recommendation.”
96 So.3d at 210. Because “ ‘[t]he prosecutor’s comments and the trial court’s instructions “accurately informed the jury of its sentencing authority and in no way minimized the jury’s role and responsibility in sentencing,” ’ ” Hagood v. State, 777 So.2d 162, 203 (Ala.Crim.App.1998) (quoting Weaver v. State, 678 So.2d 260, 283 (Ala.Crim.App.1995)), aff'd in part, rev’d in part on unrelated grounds, Ex parte Hagood, 777 So.2d 214 (Ala.1999), Riley is not entitled to any relief as to this claim.
XXII.
Finally, Riley argues that the evolving standards of decency have rendered Alabama’s method of execution by lethal injection unconstitutional. Riley failed to first present this argument to the circuit court; therefore, this Court will review it for plain error only. See Rule 45A, Ala. RApp. P.
This argument has been repeatedly considered and rejected by both the Alabama Supreme Court and this Court.
“In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“‘The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [170 L.Ed.2d 420 (2008) ], and noted that “[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.” Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.” Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’
“11 So.3d at 339.”
Boyle v. State, 154 So.3d 171, 229 (Ala.Crim.App.2013). Because Riley’s argument has been previously considered and rejected and because this Court is bound by the decisions of the Alabama Supreme Court, he is not entitled to relief as to this claim. See § 12-3-16, Ala.Code 1975.
XXIII.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the pro *766 priety of Riley’s conviction and sentence of death. Riley was indicted for and convicted of one count of capital murder — murder during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975.
The record does not reflect that Riley’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5 — 53(b)(1), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstance outweighed the mitigating circumstances. In its sentencing order, the circuit court stated that it found one aggravating circumstance: 1) Riley committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a robbery, § 13A-5-49(4), Ala.Code 1975. The circuit court then considered each of the statutory mitigating circumstances and found that several statutory mitigating circumstances were applicable, including: 1) the age of the defendant at the time of the crime; 2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and 3) that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. The circuit court found that although the latter two statutory mitigating circumstances did apply, they were not entitled to much weight. The circuit court also found that several nonstatutory mitigating circumstances were applicable, including: 1) Riley’s troubled youth; 2) his overly strict parents; 3) his serious blows to the head on more than one occasion; 4) his infant sibling dying in his arms; 5) his drug addiction; 6) his anxiety for his child’s safety; 7) the love of his family; 8) his mental-health diagnosis; and 9) his abandonment by his biological mother. The circuit court’s sentencing order shows that it properly weighed the aggravating and mitigating circumstances and correctly sentenced Riley to death. The record supports the circuit court’s findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating and mitigating circumstances in order to determine whether Riley’s death sentence is proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that Riley’s sentence of death is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Riley’s sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. In this case, Riley was convicted of one count of murder during a robbery. Sentences of death have been imposed for similar crimes throughout the State. See Byrd v. State, 78 So.3d 445 (Ala.Crim.App.2009); Melson v. State, 775 So.2d 857, 863 (Ala.Crim.App.1999); Washington v. State, 922 So.2d 145 (Ala.Crim.App.2005); and Robitaille v. State, 971 So.2d 43 (Ala.Crim.App. 2005). Therefore, this Court finds that Riley’s death sentence is neither excessive nor disproportionate.
Finally, this Court has searched the entire record, for any error that may have adversely affected Riley’s substantial rights and has found none. See Rule 45A, Ala. R.App. P.
Accordingly, Riley’s conviction and sentence of death are affirmed.
AFFIRMED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.

. The present appeal stems from Riley’s retrial following a remand by this Court. See Riley v. State, 48 So.3d 671 (Ala.Crim.App.2009) (reversing Riley’s conviction and sentence of death and remanding this case for new proceedings after holding that the circuit court’s failure to instruct the jury regarding the proper use of evidence of Riley's prior juvenile convictions was presumptively prejudicial, egregious, and rose to the level of plain error).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. In explaining the differences between felony murder and capital murder with regard to Jones, the circuit court gave the following jury instruction: "A non-trigger man accomplice may be convicted of capital murder only *716 if he had the particularized intent to kill.” (R. 1191.)

. Before trial, defense counsel filed a motion to prohibit the State from introducing victim-impact testimony and a motion requesting that the court properly instruct the jury on the role of victim-impact testimony; however, it does not appear that the circuit court ruled on those motions. (C. 48-52.) The record also reveals that Riley did not reassert his objection when the alleged improper testimony was introduced (R. 1299); therefore, this Court’s review is limited to plain error. Rule 45A, Ala. R.App. P.

. Although not argued by Riley, this Court also finds no evidence of actual prejudice. The record reflects that although 69 of the initial 90 veniremembers had read or seen media reports about the case, only 6 of those indicated that they had formed opinions about the case that they could not set aside. Those six prospective jurors were subsequently removed for cause by the circuit court.

. To the extent that Riley also argues that the circuit court allotted him a mere $1,000 for an investigator to uncover and interview potential witnesses rather than appointing a new mitigation expert, his argument is without merit and does not entitle him to relief. (Riley's brief, at 67.) Riley appears to confuse his motion for funds to hire a mitigation expert with" his ex parte motion for investigative expenses. The two motions were heard separately, with the latter being heard outside the presence of the prosecution, and the circuit court gave no indication that the $1,000’ allotted during the hearing on the ex parte motion for investigative expenses was intended to cover the costs of both the investigator and the mitigation specialist. As a result, Riley is not entitled to any relief.

. The record reveals that after the surveillance videos, State's exhibits 36, 37, and 38, were properly admitted, the State played the videos on at least five separate occasions during the course of trial. In the first three instances, the videos or portions thereof were played without any objection. The videos were once again played during the State’s direct examination of Mike Casteel, the customer who interrupted the robbery. Defense counsel objected, but he failed to state any grounds in support of his objection. The videos were played a fifth time during the cross-examination of Dewon Jones. Defense counsel objected to the playing of the videos on the ground that Jones "ha[d] no personal knowledge what went on in the store.” (R. 1096.) The circuit court subsequently overruled Riley’s objection.

. Because the jury's guilt-phase verdict established that it unanimously found beyond a reasonable doubt that an aggravating circumstance existed, the jury was not required to specify in the penalty phase which aggravating circumstance it found to apply to Riley's crime. See Brown v. State, 74 So.3d 984, 1035 (Ala.Crim.App.2010); Sneed v. State, 1 So.3d 104, 143 (Ala.Crim.App.2007).

. Finally, for the reasons stated in Part XXI of this opinion, this Court holds that Riley’s claim that the jurors were misinformed of their role in the sentencing phase of his trial is without merit.